Northern J. CALLOWAY, individually and on Behalf of LMN Productions, Inc., Plaintiff,

v.

The MARVEL ENTERTAINMENT GROUP, A DIVISION OF CADENCE INDUSTRIES CORPORATION, James Galton, Al Brodax, Michael S. Klein, Luis Quiros, the Shukat Company, Ltd., Scott Shukat, Peter S. Shukat, Esq., Defendants.

The MARVEL ENTERTAINMENT GROUP, A DIVISION OF CADENCE INDUSTRIES CORPORATION, James Galton, Al Brodax, Michael S. Klein, Luis Quiros, and LMN Productions, Inc., Third-Party Plaintiffs,

v.

The SHUKAT COMPANY, LTD., Scott Shukat, Peter S. Shukat, Esq., Third-Party Defendants.

No. 82 Civ. 8697 (RWS).

United States District Court, S.D. New York.

Aug. 1, 1986.

Pavelic & LeFlore, New York City, for plaintiff; Ray LeFlore, of counsel.

Sheber, Pomerantz & Slotnick, New York City, for third-party defendants Scott Shukat and Shukat Co., Ltd.; Sol v. Slotnik, of counsel.

Brown, Wood, Ivey, Mitchell & Petty, New York City, for defendant Luis Quiros; Stuart J.M. Breslow, of counsel.

Fred E. Scharpf, New York City, for defendants the Marvel Entertainment Group and James Galton.

Arnoff & Merin, P.C., New York City, for third-party defendant Peter Shukat; Norman Arnoff, of counsel.

Brookman & Brookman, P.C., New York City, for defendants Michael Klein and LMN Productions, Inc.; Michael D. Brookman, of counsel.

Santora & McKay, New York City, for defendant Al Brodax; Robert McKay, of counsel.

SWEET, District Judge.

Following a six-week jury trial in which a verdict was returned in their favor on each claim brought by the plaintiff Northern J. Calloway ("Calloway"), the defendants Marvel Entertainment Group ("Marvel"), James Galton ("Galton"), Al Brodax ("Brodax"), Michael Klein ("Klein"), The Shukat Company ("SCL"), Scott Shukat and Peter Shukat have brought motions pursuant to Fed.R.Civ.P. 11, 17 U.S.C. § 505, 28 U.S.C. § 1927 and the inherent powers of the court to award them costs, expenses and attorney's fees incurred during the defense of this action. Luis Quiros, with whom Calloway settled early in the trial, joins in the motions of the other defendants and seeks independent relief under Rule 4 and 28 U.S.C. § 1927. The parties have also brought cross-motions regarding the taxation of costs. For the reasons set forth below, the motions will be granted in part and denied in part.

This litigation presented the all-too-familiar bathos from a world of fantasy to that of reality involving a once-in-a-lifetime science fiction movie musical for all ages ("The Skyrider"), the failure of trust among a partnership of short and uncertain standing (LMN Productions) and the difficulties of obtaining financial support for an untried writer and producer (Calloway). As if that were not enough, Calloway, the plaintiff and protagonist, achieved enough fame and success as an actor to lead him to conclude erroneously that he did not have to stick to his last but could achieve success as a screenwriter and producer. Further he was afflicted by a diagnosed psychiatric disorder which demonstrably affected his judgment.

These factors placed a heavy burden on Calloway's counsel which he failed to discharge adequately. Most regrettably,

these factors became apparent only during and after a trial which was unduly prolonged by the assumption that there was more present than met the eye. The effort to offer Calloway every opportunity to prove his case, as argued by his counsel, was in hindsight mistaken and not in the best interest of any of the parties, as is more fully set forth below.

## The Interrelationship of the Parties

Calloway is an actor who has performed in various theatrical and television productions, the most notable being his role as David in the ongoing "Sesame Street" television show. In 1979, when he became interested in creating a science fiction movie, Calloway convinced a gift shop salesman whom he met in that capacity and who had previously sought to write movie scripts to write a synopsis for "The Skyrider." Calloway used this synopsis to write his own script which was copyrighted and then registered in 1982. During this intervening period he had met Klein, a dentist and Luis Quiros, an insurance salesman, in an equally serendipidous fashion, and the three partners sought to promote "The Skyrider" project.

Unknown to the partners, Calloway had a history of mental illness at least since 1980. In September of that year, he severely beat a woman and damaged property while in Tennessee, an incident which resulted in civil litigation and criminal prosecution. Calloway received psychiatric treatment both from a state mental hospital and through a private physician and in 1982 entered a plea of temporary insanity in connection with the Tennessee incident. Prior to the institution of this action, he had been diagnosed as a bipolar manic depressive and received psychotherapeutic and drug treatment for his illness.

Klein and Luis Quiros became shareholders along with Calloway in LMN Productions, Inc., a corporation formed in June 1981 in order to finance the production of "The Skyrider" as a motion picture.[1] None

---

**1.** In August, 1983, Quiros filed a bankruptcy petition pursuant to Chapter 13 and eventually obtained a discharge of all debts including Calloway's copyright claim. *See* Opinion of February 26, 1986.

had any prior experience in such an undertaking nor any prior business relationship with each other. Klein, however, was able to make contact with defendant Marvel, and its executive officer James Galton, who became interested in "The Skyrider." Marvel participated through its employee Brodax in creating a presentation booklet entitled "The Skyrider" to assist in seeking production money. Defendant Scott Shukat was the principal for SCL which served under contract as Calloway's personal manager and agent during the relevant time period, having performed in that capacity for over seven years. Defendant Peter Shukat was Scott's brother and Calloway's regular attorney, as he had been for over a decade.

**Prior Proceedings**

Calloway commenced this action on December 29, 1982 and the resulting pretrial proceedings are reflected in the court's opinions of March 17, 1983, June 30, 1983, December 22, 1983, July 3, 1984, October 15, 1984, January 16, 1985, January 29, 1985, August 21, 1985, and February 26, 1986. While familiarity with these opinions is assumed, the most significant aspects of these proceedings can be summarized as follows:

On June 30, 1983, the complaint was dismissed pursuant to Rule 8, Fed.R.Civ.P. for failure to plead the copyright infringement claim with sufficient specificity. The court found that the original complaint failed to specify the dates and occasions on which the alleged infringement occurred and also failed to set forth the registration number of the copyright. Moreover, that opinion noted the ambiguity in the complaint as to whether there were two copyrights on "The Skyrider" and the question as to which one was infringed.

Following service of the amended complaint, the defendants again sought to dismiss. On December 22, 1983, the amended complaint was dismissed as to defendants Peter Shukat, Scott Shukat and The Shukat Company for failure to state a copyright infringement claim against them. The complaint did not allege that Peter Shukat had a financial interest in the infringing activities or that he supervised, induced or materially contributed either to the infringement or to the distribution of the infringing work. As to Scott Shukat, the amended complaint merely contained a single conclusory paragraph stating that he "directly contributed" to Marvel's creation of the infringing work. This, however, was specifically refuted by the uncontradicted affidavit of Scott Shukat that he had no knowledge of the infringing work until long after it was prepared and distributed. Thus, the federal copyright claims against each of these defendants was dismissed along with the pendent state law claims. With regard to the other defendants, the third cause of action for conspiracy to violate the copyright act and the fourth cause of action requesting punitive damages for copyright infringement were dismissed but otherwise the complaint withstood the motions of these defendants to dismiss.

After a period of discovery, the remaining defendants Marvel, Galton, Brodax, Klein and Quiros brought a motion for summary judgment pursuant to Fed.R. Civ.P. 56. The defendants' main contention on this motion was that they were authorized to use Calloway's copyrighted work by virtue of several agreements dated June 8, 1981 between Calloway and LMN Productions (the "Option Agreement," "Writer's Agreement" and "Composition Agreement").

In opposing the summary judgment motion, Calloway submitted a fourteen-page affidavit sworn to on April 2, 1984. In that affidavit, Calloway explained that the amended complaint differed from the original complaint by omitting any reference to:

those documents which I learned in the interim, had been contrived and forged by defendants. Instead, the amended complaint charged:

52. On or about August 5, 1981, without plaintiff's knowledge or consent, Peter Shukat improperly affixed a facsimile of plaintiff's signature to a series of documents, backdated to June 8, 1981, purporting to confirm by formal

agreement the terms and conditions of a putative option for LMN to acquire "The Skyrider."

The documents referred to above, which I believe Peter Shukat contrived (and others perhaps forged) while he was my attorney and trusted advisor, are: The option agreement, the writer's agreement and the composition agreement, all dated June 8, 1981....

Although Calloway thus asserted that he had not signed these documents and therefore denied that they constituted an authentic license, he never set forth any basis for this claim. No explanation was proffered regarding the circumstances by which the documents could have been forged or the circumstances which caused Calloway to discover the alleged facsimile and forgery only after the original complaint was filed.

It is appropriate to quote at length from the court's opinion at this critical juncture in the litigation: In denying the defendants' motion for summary judgment the court found that:

Calloway does not dispute defendant's contention that the terms of the Option Agreement would authorize defendants' acts, but states by affidavit that he never signed or approved the Option Agreement and that Peter Shukat, without Calloway's knowledge, affixed a facsimile of Calloway's signature to the agreement. Later in his affidavit, however, Calloway states that he "never signed or authorized the signing of any 'option' agreement in my individual capacity. I only signed such agreements as an officer of Netta Productions, Inc. Nor did I sign any such option in August, 1981." Calloway has not explained the inconsistency between these two statements. His having signed the Option Agreement "as an officer of Netta Products, Inc." appears to be without significance in this context. Calloway annexed the Option Agreement as an exhibit to the original complaint and did not challenge the authenticity of the Option Agreement during earlier motions in this case. He appears to contend that he signed an option agreement on

June 8, 1981, in which he reserved the right to make all artistic decisions concerning "The Skyrider," but that the agreement he signed was altered without his consent, and that he did not discover these alterations until after he filed the complaint.

Calloway has by a narrow margin put sufficient facts in contention to withstand defendants' summary judgment motion. However, Calloway should be aware that this court has awarded attorney's fees against a plaintiff who was found after trial to have pursued a claim in bad faith and without factual support.

Following the denial of summary judgment, pretrial discovery continued and was marked by such acrimony between the parties that it was necessary to appoint a special master to supervise the concluding phases of discovery. In addition, Peter Shukat, Scott Shukat and SCL were reintroduced into the action as third-party defendants based on the allegations that they altered or executed agreements without Calloway's knowledge or consent and thus should be held liable as third party defendants for any judgment which might be recovered against the alleged copyright infringers. On the eve of trial, Calloway moved to reassert his state law claims against Peter Shukat, Scott Shukat and SCL based on pendent jurisdiction. This motion was granted in part to permit the trial of certain misrepresentation claims against these defendants arising out of the same facts upon which the third party claim was based.

Calloway's pretrial order, which was served March 25, 1986, set forth all of the claims still outstanding against the defendants. The pretrial order restated the allegations contained in paragraph 52 of the complaint that Peter Shukat "improperly affixed a facsimile of plaintiff's signature to a series of documents." At the final pretrial conference on March 31, 1986, counsel for Calloway was asked to clarify his client's claims regarding the alleged document tampering by Peter Shukat. At

that time, counsel stated that "[t]he claim is that there are two pages of a document, the signature[s] of which were altered and they were slapped on to another document which the man never saw or signed." At the conclusion of this conference, the court granted defendants' request for a written clarification of the document tampering claim and directed Calloway to submit an amendment to his pretrial order.

An amendment of plaintiff's pleadings and contentions was submitted by letter dated April 1, 1986. In that amendment, Calloway finally specified his claims of document tampering as follows:

The irregularities with reference to the agreements effected by and at the direction of defendant Peter Shukat included physical separation and manipulation of the pages of the agreements to which plaintiff's signature had been affixed, and the alteration of the signature pages after plaintiff had signed them by obliterating one or more words with white-out, by retouching plaintiff's signature, a portion of which had been covered, and the insertion of the signature of defendant Klein, without plaintiff's knowledge, consent or expectation of any such changes.

.     .     .     .     .

Defendant Peter Shukat did all of the foregoing, aided and abetted by the other defendants, both to defraud Calloway and to misappropriate THE SKYRIDER.

Thus Calloway at this time formally abandoned his prior allegations that Peter Shukat and others had forged or applied a facsimile of his signature to the option agreements.

Trial was commenced on April 7, 1986 by the selection of a jury which had been demanded by Calloway. It continued until May 13, 1986. Eighteen witnesses were heard, and over 326 exhibits were identified, many of which were admitted.

Calloway was further questioned about the facsimile signature claim during the course of trial. On cross-examination, he stated that he made the claim of facsimile in his amended complaint and that he had never withdrawn such a claim. In deposition testimony read at trial, Calloway stated that by using the word facsimile, he meant that his signature was placed on one document and then put on to another document and this was a facsimile because "[i]n a sense they imitate my signatures...." Calloway admitted on cross-examination that he had "no real evidence" that Peter Shukat forged his signature and no real evidence that Peter Shukat contrived the option agreements other than that which had been developed by his counsel.

At the conclusion of the plaintiff's case, the defendants moved to dismiss each of the claims raised against them. Although expressing serious reservations about many of the issues raised, the court declined to grant the motions with one exception. Calloway's claim of document tampering was dismissed since there was no evidence on which a reasonable jury could conclude that Peter Shukat had fraudulently altered or manipulated the option agreements. The only evidence presented with regard to this issue was some expert testimony which was inconclusive and not probative of wrongdoing by Peter Shukat.

After the six-week trial concluded, the jury returned a verdict in favor of all defendants. In particular, the jury answered the special verdict form in the following manner. First, the jury concluded that Calloway owned the entire copyrighted work including the material written by his associate David Stephen Roth as a work made for hire. Then the jury found that contrary to his testimony Calloway did not direct Scott Shukat not to sign the extension of the option agreements. Therefore, the option agreements were binding between Calloway and the defendants. Finally, the jury interpreted the option agreements to provide the defendants with the right to change or alter Calloway's copyrighted script and thus the use of the copyrighted material by LMN was sanctioned, and the copyright claim was denied. Finally, the jury found that neither Scott nor Peter Shukat had intentionally misrepre-

sented any material facts to Calloway, contrary to his testimony, and thus the fraud claims were denied.

The present motions were then filed with the permission of the court four weeks after the verdict was rendered, and were fully submitted on July 25, 1986.

**The Facts**

The facts, of course, were developed before the jury and constituted the foundation upon which its conclusions were reached. However, for the purposes of the issues now presented, it is appropriate that the following abbreviated facts be found.

No divergence of interest was present between the parties over the summer of 1981 when the documents which defined the relationship were prepared by Dumler & Giroux, a firm specializing in such matters, representing LMN. The execution of the documents, while not performed with the utmost punctilio, was within the customary practice in such an undertaking. The signing of certain documents by Calloway as an officer of Netta was virtually a clerical oversight of insubstantial consequence. Calloway, who rested his alteration claim on this thin base, never offered any credible evidence to demonstrate that his performance as an officer of Netta had any significance.

The only difference between the parties in September, 1981 was a difference between Brodax and Calloway as to the amount of computerized animation to be used in the contemplated production. Brodax, possessed of considerable experience in the field of animation, wanted as much as could be accommodated within the projected $5 million budget for production, and Calloway wanted more. Calloway at varying times had a more grandiose view of the budget, believing $12 million was a more appropriate figure. However, at no time did he express in a meeting with Marvel or in writing an unwillingness to proceed with production of the movie at the $5 million figure for which Marvel guaranteed to produce the film once the production financing was obtained. Marvel's interest was solely in making the film and using certain of the characters thereafter in comic books and related merchandising.

After the front money was in hand, which produced for Calloway the largest payment he had theretofore ever received for his work, LMN sought with some help from Marvel to obtain the production financing. The effort was unsuccessful. "The Skyrider" was a naive, confused and conflicted work. Certain of its characters and lyrics, e.g., Chocolate Eclair, were inappropriate and even tasteless. One of its principal characters was "Ssendam," madness spelled backward, whose attributes included, like an actor, an ability to assume many forms and persona. Calloway's belief in the project was revelatory, tragic in some regard, and unwarranted by any objective analysis, at that time or subsequently. After the fall of 1981 Calloway did not participate in any effort to obtain financing.

By early 1982 Calloway became aware of the "bookends" prepared by Brodax for use in the effort to obtain production funds. The Brodax material offended Calloway and cast "The Skyrider" in a light which he considered inappropriate and contrary to the purpose of the work. Advised by his close friend and later fiancee, who had served as a nonprofessional in a law firm, Calloway sought to obtain legal assistance to obtain redress from his former associates, Klein and Quiros, Marvel, counsel who had prepared the LMN documents, and Peter and Scott Shukat. In December of 1982 this action was brought.

At no time during the trial or during discovery was any evidence adduced to establish that Marvel's alleged infringement was responsible for any failure to obtain financing. The only damage witness was an expert retained shortly before trial whose testimony failed to provide any basis upon which any actual damages could be calculated. All that was presented therefore was a naked non-economic claim of copyright infringement. Indeed, given the nature of the copyrighted material and the activities conducted, there never was any

factual basis for any specific damages, nor any objective proof of causation.

Finally, there was little evidence regarding any intent of the defendants to misappropriate Calloway's copyright. In fact, the most probative indication of Calloway's tendency to imagine tortious conduct by the defendants was evidenced by an agitated discussion which he had with Lionel Barrett in April of 1982 that was later relayed to Peter Shukat. At that time, Calloway claimed that the reason he was so distraught during the Tennessee incident in 1980 was that he was being poisoned by Klein. Despite this conveyed certainty of mind, in fact, Calloway had not met Klein at the time of the Tennessee incident. All these circumstances placed upon Calloway's counsel a heavy burden to investigate the foundation and details of Calloway's claims.

**Discussion**

The defendants seek sanctions for the conduct of Calloway and his counsel regarding the claims asserted in this action. The standards for an award of sanctions are well-established, but, of course, it is always a difficult and consuming task to determine whether the test has been met under the particular circumstances presented by each case.

**Rule 11**

■ Under Rule 11, Fed.R.Civ.P., an attorney must certify that:

> he has read the pleading, motion or other paper; that to the best of his knowledge, information and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing laws on a good faith argument for the extension, modification or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation....

As our Court of Appeals has explained, it is no longer possible for an attorney to avoid sanctions under Rule 11 merely by espousing a sincere good faith belief in the papers submitted under his signature. *Eastway Construction Corp. v. City of New York,*

762 F.2d 243, 253 (2d Cir.1985). Instead, Rule 11 imposes an affirmative obligation on attorneys to scrutinize their own papers to determine whether the pleading is well grounded in fact and in law. The court's task in evaluating a Rule 11 motion is, therefore, to reexamine the pleadings and motions in light of the circumstances at the time they were submitted to determine whether the attorney upheld his obligation. Under the standards required by Rule 11:

> [S]anctions shall be imposed against an attorney and/or his client when it appears that a pleading has been interposed for any improper purpose *or where,* after reasonable inquiry, a competent attorney could not form a reasonable belief that the pleading is well grounded in fact and is warranted by existing law on a good faith argument for the extension, modification or reversal of existing law.

*Id.* at 254 (emphasis in original).

The defendants first urge that Calloway's copyright infringement claim was frivolous because there was no evidence that Calloway's copyrighted script was copied by the defendants. As the evidence at trial established, the allegedly infringing work was created by Marvel at the request of Klein and Quiros to assist in obtaining financing for the project. The Marvel presentation booklet appeared to have been comprised of a copy of "The Skyrider" synopsis created by David Steven Roth, a work which was itself never copyrighted. In addition, the Marvel presentation booklet included "bookends" of material independently created by Brodax with the exception of a single descriptive phrase taken from the copyrighted screenplay.

■ The defendants incorrectly assert that this conduct could not possibly constitute copyright infringement. While the defendants cite 17 U.S.C. § 103 in support of their argument, this reliance is misplaced. Section 103(b) provides that "[t]he copyright in a compilation or derivative work extends only to the material contributed by the author of such work, as distinguished from the preexisting material employed in

the work, and does not imply any exclusive right in the preexisting material." Based on this limiting language, the defendants contend that Calloway's copyright extends only to the revisions which he made to Roth's synopsis but not to the work of Roth itself. However, given the jury's finding on Question 1 of the special verdict, this limitation does not apply here. The jury concluded that Roth's synopsis was a work made for hire and thus, in accordance with 17 U.S.C. § 201(b), Calloway as the employer of Roth must be considered the author of that work as of the time it was created. Although the synopsis was not itself copyrighted, the material from the synopsis which was included in Calloway's copyrighted script did obtain copyright protection and was owned exclusively by Calloway as a work for hire. Therefore, the defendants' claim on this issue is reduced to whether the copying of a prior draft of a copyrighted work could constitute copyright infringement. Such an issue presented a question of fact which was not frivolous under the circumstances of this case. Similarly, the defense of fair use would have required a fact specific balancing of factors which would not have absolutely foreclosed Calloway's claim.

On the other hand, with regard to the issue of "unauthorized" use, an element essential to any copyright claim, Calloway had signed the Option Agreement which granted the defendants the right to use his copyrighted script for the purposes of raising financing for the proposed movie. The granting clause of the Writer's Agreement, one of two agreement annexed to the Option Agreement set forth the following transfer of rights from Calloway to LMN:

> Writer hereby grants to Producer, exclusively and perpetually, all now or hereafter existing rights of every kind and character whatsoever, whether or not such rights are now known, recognized or contemplated, and the complete unconditional and unencumbered title throughout the world in and to: Writer's services pursuant to this agreement; any and all results and proceeds thereof; and any and all literary, dramatic and musical material, incidents, plots, dialogue, characters, action, gags, routines, ideas, inventions and other material written, composed, submitted, added, improvised, interpolated and invented by Writer hereunder....

> Producer may add to, subtract from, arrange, rearrange, revise and adapt all such material in any manner, and Writer hereby waives the "moral rights" of authors, as said term is commonly understood. All such material and the worldwide copyright therein (including all renewals and extensions of such copyright) shall automatically be and become the property of Producer and Producer shall be deemed to be author thereof, Writer acting entirely as Producer's employee for hire.

Faced with this broad authorization to the defendants, Calloway opposed their summary judgment motion in April, 1984 by claiming that he did not sign the Option Agreements and that it was improperly extended by an extension agreement prepared in September, 1981. The extension agreement was signed on Calloway's behalf by his agent and attorney-in-fact, Scott Shukat, but Calloway claimed that he had directed both Scott and Peter Shukat not to grant any further extensions.

■ As to the first of these claims, it is now apparent that there was no basis in fact for Calloway's assertions and insufficient inquiry by his counsel. Calloway's statement that he did not sign the Option Agreement inserted into the action the issues of forgery, manipulation and facsimile signature which created smokescreens during the subsequent two years of discovery. A document examiner was apparently not consulted until six months after Calloway asserted by affidavit that the documents were not authentic.

This examiner testified at trial that when she was consulted by Calloway's counsel in November, 1984, she evaluated the signatures on the Option Agreement and concluded that all of the signatures written above the printed words "Northern J. Cal-

loway" were written by one person. During discovery, the defendants sought to obtain this evaluation by Calloway's document examiner, yet none of the relevant interrogatories were meaningfully answered by the plaintiff. Indeed, by order of July 3, 1985, the court barred any introduction of expert handwriting testimony due to Calloway's failure to provide appropriate discovery, unless good cause was later shown. This order was modified on the eve of trial to permit Calloway to offer the testimony of his expert witness notwithstanding the previous two years of evading appropriate discovery. At the time of trial, after another examination of the documents, Calloway dropped his claims regarding forgery and facsimile signature and focused instead on various other alleged manipulations.

■ Therefore, notwithstanding Calloway's sworn statement that he did not sign the Option Agreement, he later considered this claim to be so insubstantial that he did not seek to present it to the jury. The withdrawal of a claim does not in itself require a finding that the claim was originally asserted in violation of Rule 11, since a party may in the course of discovery obtain new facts which reveal the weakness of an allegation in the complaint. However, in the present case, the basis for Calloway's forgery and fascimile claim should have been known at the time it was originally asserted. It is apparent now that Calloway himself had no basis to make that claim, since he admitted at trial that the evidence regarding this issue was developed by his attorney and not from his personal knowledge of his signature or his actions. Calloway further stated that he was unable to determine for sure whether his signatures were authentic. On the other hand, counsel for Calloway had not yet consulted any expert at the time of the summary judgment motion, and even when an expert was obtained, no material evi-

dence of forgery or facsimile was discovered.

Given the admitted absence of any affirmative evidence from either the signatory on the documents that Calloway's signature was not genuine, it is inconceivable that this allegation could have been made in accordance with the obligations imposed by Rule 11. Instead it appears that in their ambition to maintain this action, Calloway and counsel allowed his inconclusive inability to recognize his signature to be translated into a conclusive denial of his signature. When the central basis for opposing summary judgment is proffered on such an insignificant foundation, Rule 11 sanctions are appropriate.[2]

In addition to claiming that the Option Agreement was not genuine, Calloway also asserted that Peter and Scott Shukat had improperly granted an extension of the Option Agreement without his consent. This claim, along with all the other claimed misrepresentations by Peter and Scott Shukat, involved statements and events between these parties which did not permit independent verification. Thus there is no way to determine whether or not these claims had a reasonable basis in fact.

■ Nevertheless, it is necessary to realize that these claims against Peter and Scott Shukat would not have established Calloway's claim for copyright infringement. As their principal, Calloway was necessarily responsible for all of the acts of his agents—Peter and Scott Shukat—in connection with their representation of him in The Skyrider movie project. Therefore, in addition to establishing that the Shukats committed certain wrongful acts, it would also have been necessary for Calloway to show that the copyright defendants had knowledge of the Shukats' allegedly unauthorized acts.

2. The other document manipulation claims asserted by Calloway were raised only after it became apparent that forgery or fascimile signature allegations could not be pressed any further. These evolving claims regarding white-outs, additions of another party's signature and alleged removal were so insignificant and immaterial that they were eventually dismissed by the court.

To bridge this gap, Calloway's pleadings repeatedly alleged the existence of a conspiracy between all the defendants as well as claims that other defendants aided and abetted the Shukats in their wrongful acts. Thus, by referring collectively to all the defendants Calloway sought to infer that the copyright defendants knew of the Shukats' acts. Again, however, these claims were never substantiated by facts. No circumstantial evidence was presented to indicate that either of the Shukats sought to engage in joint action with the other defendants. Indeed, the copyright claims against them were dismissed on this basis. Scott Shukat's uncontradicted affidavit established that he was unaware of the allegedly unlawful Marvel presentation until long after the Option Agreement was extended. In closing argument, Calloway's counsel never even suggested that there was evidence on the trial record of such knowledge on the part of the copyright defendants.

■ Even the final link in Calloway's copyright claim was flawed. Calloway contended at trial that the Option Agreement did not by its terms authorize the defendants to alter or change Calloway's copyrighted script during the option period. In arguing on this point, his counsel stressed that it could not have been the intent of the parties to transfer all of Calloway's rights in the property at the outset of the option period since it was at that time possible that the movie project might not have raised the necessary financing. Notwithstanding the logic of this position, the plain meaning of the Writer's Agreement contained no such limitations. Instead, the broad language quoted above was a present tense transfer which took effect as soon as the agreement became operative which in turn occurred at the time the $35,000 in front money was paid. Of course, the court is obligated to apply the plain meaning of a contract without regard to the parole evidence available. Thus, even if the jury had returned a favorable verdict on this issue, it would have been overturned by the court as a matter of law.

To be clear, Calloway's assertions at trial regarding the Shukats' misrepresentations and meaning of the Writer's Agreement cannot in themselves be considered frivolous contentions that merit Rule 11 sanctions. At the same time, however, they indicate the overall insubstantiality of Calloway's copyright action. Seen in this light, it becomes even more evident that Calloway's baseless assertion of forgery and manipulation of documents was an ill-advised attempt to bolster an otherwise weak case. It was this additional frivolous allegation which prevented analysis of the true merits of Calloway's claim at the time of summary judgment in 1984.

### 17 U.S.C. § 505

The above discussion of whether attorneys' fees may be awarded under Rule 11 is equally applicable with regard to the defendants' motion for sanctions under 17 U.S.C. § 505. This section of the copyright act provides an independent statutory basis pursuant to which "the court in its discretion may allow the recovery of the full costs by or against any party ... [including] a reasonable attorney's fee to the prevailing party as part of the costs."

■ Under the law of this Circuit, attorneys' fees are awarded to a prevailing defendant only in exceptional circumstances. *See Diamond v. Am-Law Publishing Corp.,* 745 F.2d 142 (2d Cir.1984). Such circumstances do not require a finding of subjective bad faith, but rather depend on an objective finding that the plaintiff's allegations were without merit. Given the similarity between the standard for Rule 11 violations and the standard for exceptional circumstances under § 505, an award of attorneys' fees would also be appropriate on this statutory ground. Moreover, this case is analogous to *Mailer v. RKO Teleradio Pictures, Inc.,* 332 F.2d 747 (2d Cir. 1964), where the plaintiff brought a meritless copyright claim in the face of an agreement which had authorized the defendants' actions. In such circumstances where the plaintiff brings suit for a copyright violation despite the existence of an agreement pursuant to which the defendants acted in

good faith, the imposition of attorneys' fees does not chill the availability of this federal cause of action for copyright owners who seek to enforce their rights against unauthorized uses.

In addition, the cited authorities suggest that Peter and Scott Shukat should recover attorneys' fees in connection with the copyright actions filed against them in the original complaint. As in *Diamond*, the copyright allegations were asserted against the Shukats merely as a means of obtaining federal jurisdiction over additional defendants. Where a copyright action is pressed for such a reason, attorneys' fees may be awarded no matter how meritorious are the plaintiff's state law claims. 745 F.2d at 148.

**28 U.S.C. § 1927**

■ Defendants also seek attorneys' fees pursuant to 28 U.S.C. § 1927 which provides that:

Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

While the facts described above and the prior orders of the court suggest that certain of the proceedings were marked by unnecessary and vexatious conduct by Calloway's counsel, prior abuses were corrected at the time they occurred. Moreover, to the extent that the frivolous assertion of document tampering claims resulted in the unreasonable multiplication of the pretrial proceedings, such a violation of an attorney's responsibilities is more appropriately addressed under Rule 11.

Quiros has brought a motion under § 1927 which applies peculiarly to him. Following the court's opinion of February 26, 1986, which recognized that Quiros' discharge in bankruptcy had extinguished all of Calloway's monetary claims for alleged liabilities owed by him, Quiros made an offer of settlement which provided Callo-

way with all the relief which he could possible expect to recover from Quiros. However, counsel for Calloway flatly refused this offer without explanation and continued litigation against Quiros until finally accepting the same offer after trial had commenced.

■ This motion by Quiros is well founded and indicative of the inexplicably obscure litigating postures adopted by counsel for the plaintiff. Sanctions will be awarded for counsel fees incurred during the delay caused by this resistance. The settlement agreement between Quiros and Calloway, offered prior to trial, does not prevent sanctions against opposing counsel resulting from vexatious conduct which delayed the execution of the settlement.

**Inherent Power of the Court**

■ As stated in *Nemeroff v. Abelson*, 704 F.2d 652, 654 (2d Cir.1983): "A prevailing defendant is entitled to an award of attorneys' fees if a plaintiff brings or maintains an action without adequate factual basis and in bad faith." In order to invoke the inherent power of the court, therefore, a finding of bad faith or improper purpose must be reached in addition to the findings set forth above. This court has had some experience with litigation in which the trial record revealed that incorrect versions of the facts were knowingly given by an interested party. *See Schwartz v. Malm*, 80 Civ. 6449, slip op. (S.D.N.Y. September 28, 1983) [Available on WESTLAW, DCTU database]. There, after a jury verdict which dismissed the plaintiff's malpractice claim, costs and attorneys' fees were taxed after the court concluded that false testimony had been given in order to create a factual basis for the malpractice claim.

■ In this case, it has been demonstrated that Calloway's affidavit on the summary judgment motion was set forth without adequate factual basis. There is, however, no direct evidence to indicate that he was aware at the time of his sworn statement that it was untruthful. In fact, Calloway's unusual demeanor as a witness at trial suggests that he may have been

unaware of the consequences of his statements. On numerous occasions during his trial testimony, Calloway displayed an unabashed willingness to testify in a manner directly contradictory to his prior deposition testimony. When confronted with these inconsistencies, Calloway simply replied that he had no explanation. I conclude from these affectless responses that Calloway's inability to give consistent and forthright testimony resulted from his willingness to follow his attorney's advice rather than his own intent to misrepresent the facts. In addition, one must give some consideration to the medical history of Calloway which creates some uncertainty about his capability as a witness. Thus, I conclude that bad faith on the part of Calloway has not been established.

■ In addition, it is necessary to consider whether there has been bad faith on the part of Calloway's counsel. Counsel's failure to develop any evidence of joint participation by the copyright defendants in the allegedly unauthorized acts of Calloway's agents and the continuation of the lawsuit after dropping the forgery and facsimile signature claims come very close to establishing bad faith. *See Nemeroff, supra*, 704 F.2d at 659. However, I conclude that counsel's actions were not motivated by an improper purpose but rather resulted from his difficulty in evaluating and managing the issues raised by this litigation. In particular, despite the allegations of multimillion dollar damages, counsel failed to make any attempt to establish a foundation for these economic damages until just a few weeks before trial when he first consulted an expert witness regarding the value of movie merchandising rights. Even this expert was not competent to establish whether Calloway's script was likely to be produced and financed. Perhaps the positions taken by counsel were designed to induce a profitable settlement. It is equally possible that the difficulties resulted from a conviction that Calloway's persuasive abilities could convince a jury to return a favorable verdict. Indeed, Calloway's protracted direct examination supports the latter view. On balance, while I

conclude that counsel failed to recognize his responsibility to research the factual basis of the claims thoroughly, to evaluate the extremely limited merits of this action and to assist a pliant client with limited capabilities, I do not believe that counsel's deliberate bad faith has been established.

**The Measure of Sanctions**

Since it has been concluded that sanctions are appropriate under Rule 11, and alternatively that this was an exceptional case meriting an award of attorneys' fees pursuant to 17 U.S.C. § 505, the amount of sanctions to be awarded must be determined.

This has been a long, arduous and expensive suit. After three and a half years of pretrial proceedings and six weeks of trial, it is no surprise that the legal bills rendered to the defendants and their insurance carriers have been enormous. According to the affidavits submitted in support of the present motions, the defendants have incurred the following attorneys' fees: Marvel and Galton—$297,000; Brodax—$221,000; Klein—$165,000; Peter Shukat—$151,000. Defendants Scott Shukat and SCL have not set forth the legal fees incurred in defense of this action but have indicated that more than $60,000 were billed for the period between November, 1985 and May, 1986. Defendant Quiros was represented on a *pro bono* basis. Therefore, in the aggregate, the defendants have been forced to incur approximately $900,000 in attorneys' fees by reason of this action. Calloway has not contended that these attorney fees are unreasonable.

■ Under Rule 11, a court is not obligated to grant the full amount of attorneys' fees incurred by the prevailing parties, since such an award is primarily intended to impose a deterrent sanction against the conduct of plaintiff's counsel rather than simply to compensate the defendants for their out-of-pocket losses. *See Anschutz Petroleum Marketing Corp. v. E.W. Saybolt & Co., Inc.*, slip op., 82 Civ.

4498 (S.D.N.Y. April 22, 1986) [Available on WESTLAW, DCTU database].[3] In determining an appropriate sanction, a court should consider the gravity of the Rule 11 violation, the circumstances of the violation within the context of the case, and the financial resources of the respective parties. As to this last factor, there is no evidence on the record regarding the financial condition of either Calloway or his counsel. However, I can quickly conclude that an award of the full amount of the attorneys' fees would be extremely onerous for anyone other than a substantial corporation. Furthermore, the Rule 11 violation was limited to only one of several issues raised by the plaintiff and cannot be regarded as causing all of the expenses incurred by the defendants. On the other hand, I regard the violation in this case to be a very serious breach of the obligations of an attorney to conduct a reasonable inquiry into the factual circumstances underlying a pleading or motion, for this case could have been resolved at a much earlier stage if the baseless assertions of forgery and document manipulation had not been made. Perhaps this case is a classic demonstration of the desireability of the English practice, toward which Rule 11 seems to be pointing. However, the journey has not yet been completed, and it is necessary under our present practice to assess costs and expense on an other than an automatic basis.

■ I conclude, therefore, that a substantial sanction should be imposed. Under the circumstances set forth above, a sanction of $200,000 should impose upon the plaintiff and his counsel a sobering realization of the transgressions which have been committed. This amount is also roughly equivalent to the average expense of each defendant and thus reflects the burden which each was forced to bear without unduly punishing the plaintiff.

3. Similarly, an award of attorneys' fees pursuant to the statutory authority of 17 U.S.C. § 505 is "at bottom an equitable matter" which is within the discretion of this court. *Faraci v. Hickey-Freeman Co., Inc.*, 607 F.2d 1025, 1028 (2d Cir.1979). The award of attorneys' fees pur-

I also conclude that the sanctions should be borne equally by Calloway and his counsel. It is, of course, difficult to allocate responsibility for the frivolous assertions made by Calloway and on his behalf by counsel, especially where the plaintiff has a history of mental illness which may have contributed to his lack of restraint in this action. However, it is apparent from the record that Calloway, by his sworn statements, and counsel by his failure to investigate the basis for those statements, each contributed to the violation of Rule 11. Each person failed to uphold his responsibility to set forth accurate facts in opposition to the defendants' motion for summary judgment, perhaps in the vain hope that the other person had some basis for such assertions. In any case, each will be assessed sanctions of $100,000. These sanctions will be awarded pro rata to each defendant in proportion to the amount each expended to defend this action, with the exception of Quiros who agreed to settle before the conclusion of trial without costs against Calloway.

■ In addition, I conclude that Peter and Scott Shukat are each entitled to a reasonable attorneys' fee of $5,000 for defending against the copyright claims which were dismissed on the pleadings and that counsel for Quiros is entitled to $23,000 for the vexatious conduct which delayed his settlement.

**Cross-Motions Regarding Taxation of Costs**

■ Calloway and the defendants have brought cross-motions pursuant to Rule 54(d) contesting the costs taxed against Calloway by the clerk of the court on June 27, 1986. Calloway asserts that the fees of the Special Master should not be included in the costs because at the time of his appointment the court decided that:

suant to this alternative holding would be in the same amount as the sanctions awarded under Rule 11 since I conclude, even without supporting affidavits by the plaintiff, that a full award of the defendants' aggregate attorneys' fees would subject Calloway to financial ruin.

The Special Master will be compensated monthly on an hourly basis at his customary rates and will submit statements to the parties to that end, each party to pay his or its aliquot shares. Upon final resolution of this action, these payments may be subject to a further application for costs.

Master's fees are ordinarily taxable as costs, unless otherwise ordered by the court. Local Rule 11(c)(8). As provided by Local Rule 19(d) which more specifically addresses the taxation of master's fees: "Where, however, the court directs by order the party against whom, or the proportion in which [a master's] compensation and disbursements shall be charged, ... the party making payment to the master shall be entitled to tax such compensation or disbursements only against such parties and in such proportions as the court has directed...." The order which provided for proportionate sharing of the master's fees was never altered following the conclusion of trial or the entry of judgment. In accordance with Local Rule 19(d), this order prevails over the customary taxation of master's fees and therefore the costs will be amended to omit them.

The parties also dispute whether the court reporter fees for "transcript[s] necessarily obtained for use in the case" where appropriately taxed by the clerk. Peter Shukat claimed such costs in the amount of $6,979.32 which the clerk reduced to $5,861.60. Marvel and Galton requested such costs in the amount of $11,333.20 which were disallowed entirely. The costs attributable to Marvel and Galton were billed in connection with the daily transcripts ordered for two pretrial conferences and the trial. It is unclear for what proceedings Peter Shukat claimed transcription costs.

■ I conclude that the daily transcripts for the trial and the two conferences were indeed necessary and not merely convenient. *See In re Air Crash Disaster,* 687 F.2d 626, 632 (2d Cir.1982). Here, just as in *Galella v. Onassis,* 487 F.2d 986, 999 n. 22 (2d Cir.1973), the transcripts were

needed because "the amounts claimed were large, the trial was of considerable length, and credibility crucial." Therefore, the transcription costs claimed by Marvel and Galton will be granted.

■ Apparently, Peter Shukat did not order transcripts during the trial but instead shared the transcripts ordered by Marvel and Galton. Thus, lacking any explanation by Peter Shukat, it appears that these costs were connected to pretrial depositions. There is no reason to shift these costs to Calloway and, therefore, the taxed costs will be amended to omit them.

■ Calloway also challenges the amounts taxed in favor of Peter Shukat and Marvel on the grounds that they are excessive. However, since Calloway failed to make these objections in writing or at the time of taxation, the clerk had discretion to tax those costs in the amount he considered appropriate. *See* Local Rule 11(b).

Finally, Calloway's motion to stay the taxation of costs during the pendency of his appeal has been mooted by a lack of prosecution of that appeal resulting in its dismissal.

### Conclusion

For the reasons set forth above, the defendants will be granted $200,000 in attorneys' fees as Rule 11 sanctions. The award will be divided as follows in amounts proportional to the fee statements submitted by counsel for the defendants. Thus, Marvel and Galton will be awarded $66,000; Brodax, $49,440; Klein, $37,000; Peter Shukat, $33,860; Scott Shukat and SCL, $13,700. These amounts will be paid equally by Calloway and his counsel, Pavelic & LeFlore.

Peter Shukat will be awarded $5,000 and Scott Shukat and SCL will be awarded $5,000 to be paid by Calloway pursuant to 17 U.S.C. § 505. Finally, counsel for Quiros is entitled to $23,000 from Pavelic & LeFlore as a sanction under 28 U.S.C. § 1927.

The clerk is directed to amend the bill of costs to eliminate all requests to tax the special master fees and to eliminate Peter Shukat's request to tax the costs of transcripts. The clerk is directed to award Marvel and Galton their request to tax costs in the amount of $11,333.20 for the cost of trial and conference transcripts.

IT IS SO ORDERED.