In the Matter of OMEGA TRUST, et al., Debtors.

Edward S. KANBAR, Appellant,

v.

CHRISTIAN DE VILLE DE GOYET and Pierre Drion, as Trustees of Omega Trust, Geomer Corporation, Cadrest (Dallas) Inc., Cadillac Restaurants, Inc., Cadrest (Houston) Inc., Neuter Limited, GNS Corporation (d/b/a Genius Corporation), Cadillac Bar Inc., Moncar Investments Inc. and Kenneth Newman, Appellees.

No. 90 Civ. 2913 (RWS).

United States District Court, S.D. New York.

Sept. 25, 1990.

As Amended Oct. 26, 1990.

Edward S. Kanbar, appellant pro se.

Patterson Belknap Webb & Tyler, for Appellees, New York City (David W. Dykhouse and Andrew D. Schau, of counsel).

## OPINION

SWEET, District Judge.

Edward S. Kanbar ("Kanbar") appeals from the February 5, 1990 decision of the Bankruptcy Court, the Honorable Cornelius Blackshear, which assessed sanctions against him under Bankruptcy Rule 9011 [1]

---

1. Rule 9011. Signing and Verification of Papers.

    (a) ... The signature of an attorney or party constitutes a certificate that the attorney or party has read the document; that to the best of the attorney's or party's knowledge, information, and belief formed after reasonable inquiry it is well-grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law; and that it is not inter-

posed for any improper purpose, such as to harass, to cause delay or to increase the cost of litigation.... *If a document is signed in violation of this rule, the court on motion or on its own initiative, shall impose on the person who signed it, the represented party, or both, an appropriate sanction, which may include an order to pay to the other party or parties the amount of the reasonable expenses incurred because of the filing of the document,*

in the amount of $107,293, for filing the bankruptcy petitions in this case, 110 B.R. 665. For the following reasons, the sanctions are affirmed, but the case is remanded for reconsideration of the type and amount of sanctions to be awarded.

## The Parties

This case represents a small skirmish in an international legal battle which followed the dissolution of the twenty-four year marriage of Kenneth and Fanny Sara Newman. Mrs. Newman, currently residing in France, has instigated several lawsuits against her ex-husband, an Australian, in various jurisdictions around the world, attempting to claim a share of Mr. Newman's financial empire, which has a purported value of $30 million. Kanbar has been Mrs. Newman's lawyer for her United States claims.

Briefly stated, Mrs. Newman claims that her husband defrauded her of her fair share of the couple's community property through the use of off-shore bank accounts, trust funds, and a complex hierarchy of domestic and offshore corporations. At the summit of the hierarchy is Omega Trust ("Omega"), a trust organized under the laws of the Cayman Islands, originally for the ostensible benefit of Mrs. Newman, her parents, and Mr. Newman's children. Omega owns all of the stock of Neuter Limited ("Neuter"), a Cayman Islands corporation, which in turn owns all of the stock of Cadillac Restaurants, Inc. ("CRI"), a Delaware corporation. Further down the chain, CRI owns all of the stock of Moncar Investments, Inc. ("Moncar"), Cadrest (Houston), Inc. ("CH"), Cadrest (Dallas), Inc. ("CD"), and Cadrest (New York), Inc. ("CNY"), all Delaware corporations. Finally, Moncar owns all of the stock of Geomer Corporation and Genius Corporation, both Delaware corporations, and 49% of the stock of Cadillac Bar, Inc. ("CBI") a Texas corporation.[2] According

to Mrs. Newman, Omega is also a principal in the Liechtenstein-based Femmar Foundation ("Femmar").

## The Proceedings Below

### A. The Involuntary Petitions

This case began on July 17, 1989, when Kanbar filed, on Mrs. Newman's behalf, eleven "voluntary" bankruptcy petitions seeking Chapter 7 protection for Omega, Femmar, and each of the Neuter corporations. Attached to each petition was a statement of background information, which set forth the underlying organization of the Omega hierarchy and which disclosed the following facts:

—The official Protector Trustee of Omega was Philip Forlenza ("Forlenza"). Forlenza had been appointed by the previous Protector, Mr. Newman.

—Omega owned and controlled all of the Neuter corporations.

—Mrs. Newman claimed that she had at one time owned one-half of the assets that had originally been put into Omega.

—Mrs. Newman claimed to have been defrauded of her interest in Omega by Mr. Newman and by Forlenza acting at Mr. Newman's direction.

Each petition identified Mrs. Newman as the "beneficial owner" of the petitioner, and was signed by Kanbar as "Attorney for Petitioner."

Kanbar's legal theory, as advanced in the court below and on appeal, was that because of the fraud of Mr. Newman and Forlenza, who was Mr. Newman's lawyer,[3] Mrs. Newman had the right to assert her beneficial ownership and control over Omega as the "true" Protector Trustee, in Forlenza's place. From this position, she could:

—remove Omega's operating trustees and appoint new ones, who could then

*including a reasonable attorney's fee.* (emphasis added)

**2.** All of the corporate entities owned and controlled by Omega will be referred to simply as "the Neuter corporations."

**3.** Mrs. Newman also claimed that Mr. Forlenza had represented her in past transactions involving Omega, and that therefore he and his firm, Patterson, Belknap, Webb & Tyler, should have been disqualified from representing Omega and Mr. Newman in this case. The court rejected this argument.

approve the voluntary petition for Omega;

—by exercising Omega's control over the Neuter corporations, convene shareholders meetings and replace the officers and directors with people who could approve the Neuter corporations' voluntary petitions;[4] and

—by exercising Omega's control over Femmar, approve its voluntary petition.

### B. The Response

The Omega entities responded on August 9, 1989 by an order to show cause to dismiss the petitions. At a hearing on this issue, Kanbar submitted a "Debtors' Preliminary Statement" on behalf of the Omega entities, in which he reiterated the underlying facts and again set forth the legal theory on which the petitions were based. Attached to the statement were a series of documents captioned as corporate resolutions for Neuter, Moncar, CD, CH, CNY, Genius, and CBI, signed by Kanbar as secretary for each corporation.[5] Each resolution recited that a shareholders' meeting had been held on July 15, 1989 at Kanbar's office, attended by 100% of the corporation's shareholders,[6] that the shareholders had removed all of the corporation's directors and officers and elected Mrs. Newman and Kanbar as directors, that these directors had then appointed Mrs. Newman as president and Kanbar as secretary of the corporation, and that the directors had then adopted a resolution approving the corporation's voluntary bankruptcy petition. At the bottom of each resolution was

the notation "(corporate seal)," presumably because Kanbar had no access to the actual seals of any of the corporations.

Faced with the possibility that the voluntary petitions would be dismissed at the August 9 hearing, Kanbar also presented a motion for leave to refile the voluntary petitions as involuntary petitions brought by Mrs. Newman as a creditor of each of the Omega entities. Judge Blackshear declined to rule on this motion, other than to agree with Mr. Newman's counsel that such a motion was "ridiculous." Transcript of August 9, 1989 Hearing at 11.

The Omega entities primary argument in support of dismissal was that Mrs. Newman was not the Protector Trustee of Omega, and that therefore Mrs. Newman and Kanbar had lacked all authority to file the petitions. It appears from the record that Kanbar made no attempt to contradict any of Omega's evidence, but merely attempted to explain his legal theory, under which Mrs. Newman's actions, although unauthorized in fact, should have been held to be valid as constructive acts of the Omega entities. More than once during the hearing Judge Blackshear warned Kanbar that he faced possible sanctions if he could not provide a reasonable basis for having filed the petitions.[7]

At the conclusion of the hearing, Judge Blackshear reserved his decision on the motions to dismiss, and scheduled another hearing for August 17, at which the parties could argue further on the motion to dismiss.

---

4. It is unclear how CBI was to be dealt with under this theory, as Moncar controlled only 49% of its outstanding stock.

5. It is not clear from the record whether there were resolutions for the other Omega entities as well, or, if there were not, why not.

6. With respect to CBI, this statement seems to have been inaccurate, as even under Mrs. Newman's claim of control over Omega and its subsidiaries she could only represent 49% of its shareholders.

7. For example:
THE COURT: What we have here, we have approximately ten corporations that a volun-

tary petition was filed for—for which voluntary petitions were filed.
We also have an allegation that the parties who filed these petitions did not have the proper authority.
Now, I will tell you that if those allegations are correct, [Omega's] counsel is absolutely right that we are looking now at sanctions either under Rule 9011, or if I were to grant [the motion to treat the petitions as involuntary,] there are sanctions under Section 303 [of the Bankruptcy Code] also which covers involuntary filings.
Transcript of the August 9, 1989 hearing at 16–17.

## C. The August 17 Hearing

At the beginning of the August 17 hearing, Kanbar again tried to explain his legal theory to the court, when he sought to enforce subpoenas seeking testimony from Forlenza and others who had been involved with Omega's administration:

> MR. KANBAR: This is an evidentiary hearing in order to prove that which was done. We served subpoenas on various parties and it is very important that those people be here.
>
> For example, *the question is who owns the Trust? The Protector of the Trust is not here. The Protector of the Trust is one of the people that was subpoenaed, Mr. Philip Forlenza.*
>
> . . . .
>
> THE COURT: *[Y]our allegation is that you filed these petitions because Mrs. Newman was the beneficiary holder of the Trust.* Why do you need now to Subpoena the parties who are the Protectors of the Trust?
>
> MR. KANBAR: Number one, this is a complicated case. We filed as the beneficial owners of the Trust, and we have to prove that she is the beneficial owner of the Trust.

Transcript of Hearing, August 17, 1989 at 35–36 (emphasis added).

After the judge denied Kanbar's request, Omega introduced testimony from Mr. Newman and from one of the two operating trustees of Omega. For the most part, this testimony reiterated the evidence presented at the earlier hearing regarding the people who were authorized to act for Omega and its corporations, in essence re-proving facts which Kanbar had been willing to concede from the outset. Following the testimony of these witnesses, Judge Blackshear again warned Kanbar that he was risking sanctions in pressing this argument. Following a recess and a conference off the record, Kanbar voluntarily withdrew all of the petitions. The judge accepted the withdrawal, and, on oral motion of defense counsel, ruled that sanctions were warranted against Mrs. Newman and Kan-

bar because "there was not a scintilla of evidence to warrant the filing of these petitions by Mrs. Newman." Transcript of August 17, 1989 Hearing at 129. A hearing was scheduled for September 28 to consider the amount of the sanctions.

## D. The Subsequent Filings

After Judge Blackshear had determined that sanctions were warranted for the original petitions and had signed orders dismissing the petitions pursuant to Kanbar's withdrawal of them at the August 17 hearing, on September 1, Kanbar filed motions for rehearing on all of the petitions, asking the court to reconsider the dismissals. The basis for the motions was Kanbar's assertion that the voluntary withdrawal negotiated on August 17 was conditioned on all parties agreeing to drop all of their claims against one another, with only the motion for sanctions to survive, and that the judgments entered on the dismissal apparently made no mention of such a condition. Kanbar subsequently withdrew these motions on September 13.

## E. The Sanctions Hearing

In the September 28 hearing, Omega presented evidence of its attorneys' fees and the expenses for the witnesses who appeared at the August 17 hearing, as well as some evidence of how one of the corporations, CNY, had experienced some problems with its suppliers when they learned that a bankruptcy petition had been filed on its behalf. Kanbar argued that many of the legal fees had been unnecessary, as he had been willing to concede many of the facts which the defense insisted on proving. Kanbar also argued that he would be unable to pay all of Omega's costs and fees, and that a lesser amount would be an appropriate deterrent. Following the hearing, Mr. Kanbar submitted a personal financial statement which substantiated his claim of inability to pay.[8]

On February 5, 1990, Judge Blackshear issued an opinion assessing sanctions in the amount of $107,293 against Kanbar and Mrs. Newman jointly and severally. This

---

8. The statement indicated that Kanbar possessed assets valued at $132,000 and faced liabil-
ities in excess of $191,000, leaving him a negative net worth of nearly $60,000.

amount represented the Omega entities' entire attorneys' fees and witness expenses, but excluded "loss of services" claims by Mr. Newman and the operating trustee of Omega for their time spent at the August 17 hearing. In the opinion, Judge Blackshear stated that "[s]omeone has to pay for this folly and it should not be Mr. Newman." 110 B.R. at 675.

*Discussion*

█ The standards for reviewing an award of sanctions under Rule 9011 are the same as those for sanctions under Rule 11 of the Federal Rules of Civil Procedure. *See, e.g., In re Food Workshop, Inc.,* 70 B.R. 962, 966 (Bankr.S.D.N.Y.1987). The Supreme Court recently clarified these standards: "[A]n appellate court should apply an abuse-of-discretion standard in reviewing all aspects of a district court's Rule 11 determination." *Cooter & Gell v. Hartmarx Corp.,* —— U.S. ——, 110 S.Ct. 2447, 2461, 110 L.Ed.2d 359 (1990). The Court explained that review of a sanctions award involves three distinct issues:

> The court must consider factual questions regarding the nature of the attorney's prefiling inquiry and the factual basis of the pleading or other paper. Legal issues are raised in considering whether a pleading is "warranted by existing law or a good faith argument" for changing the law and whether the attorney's conduct violated Rule 11. Finally, the district court must exercise its discretion to tailor an "appropriate sanction."

110 S.Ct. at 2457. Because there is ample evidence in the record which supports the lower court's decision on the first two of these issues, there is no abuse of discretion in the award of sanctions against both Kanbar and his client. The only question which remains is whether the lower court's determination of the type and amount of sanction to award was appropriate.

After determining that sanctions against Kanbar were required, Judge Blackshear listed twelve types of sanctions available, ranging from a reprimand to monetary sanctions to an injunction limiting a lawyer's access to the court. 110 B.R. at 673. He then set forth sixteen "mitigating and aggravating factors" which the court should consider in selecting the appropriate sanction:

(1) The good faith or bad faith of the offender;

(2) The degree of willfulness, vindictiveness, negligence, or frivolousness involved in the offense;

(3) The knowledge, experience and expertise of the offender;

(4) Any prior history of sanctionable conduct on the part of the offender;

(5) The reasonableness and necessity of the out-of-pocket expenses incurred by the offended person as a result of the misconduct;

(6) The nature and extent of the prejudice, apart from out-of-pocket expenses, suffered by the offended person as a result of the misconduct;

(7) The relative culpability of client and counsel, and the impact on their privileged relationship of an inquiry into that area;

(8) The risk of chilling the specific type of litigation involved;

(9) The impact of the sanction on the offender, including the offender's ability to pay a monetary sanction;

(10) The impact of the sanction on the offended party, including the offended person's need for compensation;

(11) The relative magnitude of sanction necessary to achieve the goal or goals of the sanction;

(12) Burdens on the court system attributable to the misconduct, including consumption of judicial time and incurrence of juror fees and other court costs;

(13) The degree to which the offended person attempted to mitigate any prejudice suffered by him or her;

(14) The degree to which the offended person's own behavior caused the expenses for which recovery is sought;

(15) The extent to which the offender persisted in advancing a position while on notice that the position was not well grounded in fact or warranted by existing law or a good faith argument for the extension, modification or reversal of existing law; and

(16) The time of, and circumstances surrounding, any voluntary withdrawal of a pleading, motion or other paper.

110 B.R. at 673–74 (citations omitted). However, after enunciating these factors, Judge Blackshear proceeded to apply them to the case before him by stating simply that "[n]one of the above factors weighs heavily, if at all, in favor of Mr. Kanbar and Mrs. Newman." 110 B.R. at 674. The only specific findings made by the lower court seem to concern factors (1), (2) and (3):

This Court, as previously mentioned, is suspect of the intentions and good faith of Mr. Kanbar and Mrs. Newman in filing the bankruptcy petitions. Mr. Kanbar is a seasoned attorney who, if not familiar with the bankruptcy laws, was under an obligation to make a full investigation on the merits of the bankruptcy petitions prior to filing them. Furthermore, the conduct of Mrs. Newman, prior to appearing before this Court, indicates an intention to harass Mr. Newman rather than exercise any of her legal rights.

*Id.*

These findings are not clearly erroneous. However, the award must be vacated and remanded for reconsideration of the type and amount of sanctions to be awarded. *Cooter & Gell* explicitly authorizes an appellate court in a sanctions case to review the lower court's determination of the appropriate sanction under an abuse of discretion standard. 110 S.Ct. at 2457.

To the extent that Judge Blackshear's statement that "[n]one of the above listed factors weigh heavily, if at all, in favor of Mr. Kanbar" can be regarded as a collective finding regarding the remaining 13 factors ((4)–(16)), that finding might be considered erroneous in the absence of any stated basis, especially with respect to factors (4), (9) and (11). On the remaining factors, particularly (5), (10), (13), (14), and (15), a more detailed explanation of how they affect the final determination is appropriate.

█ Judge Blackshear's explanation that "[s]omeone has to pay for this folly and it should not be Mr. Newman" sug-gests a belief that sanctions are intended to shift the costs of frivolous litigation to the sanctioned party. This is not the case, as the Supreme Court made clear in *Cooter & Gell* (decided subsequent to Judge Blackshear's opinion). "It is now clear that the central purpose of Rule 11 is to deter baseless filings...." 110 S.Ct. at 2454. *See also White v. General Motors Corp.,* 908 F.2d 669, 684 (10th Cir.1990) ("As we have already stated, the primary purpose of sanctions is to deter attorney and litigant misconduct, not to compensate the opposing party for its costs in defending a frivolous suit."); *Gaiardo v. Ethyl Corp.,* 835 F.2d 479, 483 (3d Cir.1987) ("The goal of Rule 11, therefore, is not whole scale fee shifting but correction of litigation abuse."); *Calloway v. Marvel Entertainment Group,* 111 F.R.D. 637, 650 (S.D.N.Y. 1986) ("Under Rule 11, a court is not obligated to grant the full amount of attorneys' fees incurred by the prevailing parties, since such an award is primarily intended to impose a deterrent sanction against the conduct of plaintiff's counsel rather than simply to compensate the defendants for their out-of-pocket losses."); *Eastway Construction Corp. v. City of New York,* 637 F.Supp. 558, 565 (E.D.N.Y. 1986) (Rule 11's purpose of deterrence is served by awarding "the minimum that will serve to adequately deter the undesirable behavior"), *modified,* 821 F.2d 121 (2d Cir.), *cert. denied,* 484 U.S. 918, 108 S.Ct. 269, 98 L.Ed.2d 226 (1987). Therefore, the sanctioning court must carefully weigh the effect that an award will have on the sanctioned party, and select the minimum amount necessary to have the desired deterrent effect.

█ It also appears that factor (9)— "[t]he impact of the sanction on the offender, including the offender's ability to pay a monetary sanction"—clearly favors Kanbar. Following the September 28 hearing, Kanbar presented a financial statement which disclosed that he had a negative net worth of almost $60,000. In the face of this evidence, the court's determination that this factor did not "weigh heavily" against assessing sanctions of over $100,-

000 against Kanbar and his client is clearly erroneous. *See O'Malley v. New York City Transit Authority*, 896 F.2d 704, 709 (2d Cir.1990) (appropriate award should "further the purposes behind amended Rule 11, but not unduly or unjustly punish an offender"); *Calloway*, 111 F.R.D. at 650–51 & n. 3 (under Rule 11 court would not award full amount of defendant's attorneys' fees, because such an award would "subject [plaintiff] to financial ruin").[9]

As for factor (4), "[a]ny prior history of sanctionable conduct," there is no evidence in this record which indicates that Kanbar has a history of frivolous litigation. This being the case, it is hard to conceive of a situation in which this factor could weigh more heavily in Mr. Kanbar's favor, thus the court's failure to consider it in mitigation of the award is clearly erroneous.

The lower court's implied finding that none of the other factors favored Kanbar is not clearly erroneous, but on remand it would be appropriate for to clarify the findings concerning all of the factors, particularly (4), (5), (10), (13), (14) and (15).

Factors (5) and (13) relate to the degree of frivolousness and willfulness on behalf of the sanctioned party. The Second Circuit has generally been reluctant to approve awards of full attorneys' fees except in the most egregious of cases. *See, e.g., City of Yonkers v. Otis Elevator Co.*, 844 F.2d 42, 49 (2d Cir.1988) (awarding full $5,000 costs attributable to plaintiff's failure to withdraw claims which it conceded were meritless); *United States v. Carley*, 783 F.2d 341, 345 (2d Cir.1986) (awarding full costs against plaintiff whose arguments had previously been rejected by circuit court), *cert. denied*, 476 U.S. 1142, 106 S.Ct. 2251, 90 L.Ed.2d 697 (1986). Although Judge Blackshear ultimately found Kanbar's argument to be "completely lacking in merit," no affirmative basis is set forth to support the conclusion that Kanbar possessed the degree of willfulness which justified awarding Omega's entire costs.

As for factor (10), "the offended person's need for compensation," there was ample evidence in the record that Mr. Newman and/or Omega Trust had substantial assets.

Finally, in evaluating factors (5), (13), and (14), the court should have considered Omega's behavior in defense of the action. A review of the record suggests that much of the time during both hearings was spent by Omega presenting evidence which might not have been necessary, because it was presented to prove facts which Kanbar did not contest, such as the fact that Mrs. Newman had no "recognized" authority to act for either Omega or any of the Neuter corporations, or facts establishing the relationships between the Omega entities—facts which Kanbar himself had set forth in the background statements which accompanied the original petitions. *See Oliveri v. Thompson*, 803 F.2d 1265, 1280 (2d Cir.1986) (awarding less than full costs where determination that claim was frivolous could have been made prior to any proceedings), *cert. denied sub nom. County of Suffolk v. Graseck*, 480 U.S. 918, 107 S.Ct. 1373, 94 L.Ed.2d 689 (1987).

### Conclusion

Because the record amply supports Judge Blackshear's conclusion that Kanbar's behavior violated Bankruptcy Rule 9011, the sanctions are affirmed. However, because the decision on the type and amount of the sanctions awarded is not adequately supported by the record, the case is remanded for the purpose of reconsidering the appropriate award.

It is so ordered.

---

**9.** It also appears that the award of sanctions against both Kanbar and Mrs. Newman "jointly and severally" is unsupported, as both the effect of the sanctions on each party and the ability to pay is likely to be dissimilar. Furthermore, the fact that Mrs. Newman currently resides in France suggests that any award against her may be uncollectible. On remand, the court should reconsider whether to allocate the award between Kanbar and Mrs. Newman individually.