In re Peter Paul MITRANO, Respondent.

A Member of the Bar of the District of Columbia Court of Appeals (Bar Registration No. 410441).

No. 07–BG–656.

District of Columbia Court of Appeals.

Argued June 12, 2008.

Decided July 17, 2008.

Peter Paul Mitrano, pro se.

Traci M. Tait, Assistant Bar Counsel, with whom Wallace E. Shipp, Jr., Bar Counsel, and Judith Hetherton, Senior Assistant Bar Counsel, were on the brief, for the Office of Bar Counsel.

Before RUIZ and THOMPSON, Associate Judges, and FARRELL, Associate Judge, Retired.*

FARRELL, Associate Judge, Retired:

This original disciplinary matter is before us on the recommendation of the Board on Professional Responsibility to disbar respondent (hereafter Mitrano) and require restitution as a condition of reinstatement. The recommendation is based on findings of fact by a Hearing Committee, "adopted ... with minor revisions" by the Board, and the conclusions of both the Hearing Committee and the Board that Mitrano engaged in misconduct consisting of the following violations of the District of Columbia Rules of Professional Conduct: 8.4(b) (commission of "criminal act," here theft); 8.4(c) (dishonesty); 1.15(a) (misappropriation); 1.15(b) (failure to notify client of receipt of funds); 1.15(c) (failure to segregate funds); 1.17(a) (failure to deposit funds in separate account); and 1.4(a) (failure to inform client). Underlying all of the violations is the Board's determination that Mitrano took and spent for his own purposes the entirety of a January 8, 1998 check for $241,336.59 issued by the District of Columbia government to his client, Dano Resource Recov-

---

* Judge Farrell was an Associate Judge of the court at the time of argument. His status changed to Associate Judge, Retired, on July 1, 2008.

ery, Inc. (Dano), knowing that the funds— or at least the major part of the funds— did not belong to him.

 Like the Board, this court must accept subsidiary findings of fact by the Hearing Committee that are supported by substantial evidence in the record viewed as a whole. *See* D.C. Bar Rule XI, § 9(g); *In re Micheel,* 610 A.2d 231, 234 (D.C. 1992). At the same time, the Board and the court review *de novo* the Hearing Committee's determination of " 'ultimate facts'[,] which are really conclusions of law." *Id.* (citation omitted); *see also In re Appler,* 669 A.2d 731, 738 (D.C.1995). Here, we agree with the Board that the Hearing Committee's findings of fact have substantial, even strong, support in the record as a whole. Moreover, we agree with the Board's legal conclusions and accept its recommendation of disbarment as required by our decisions. *See, e.g., In re Addams,* 579 A.2d 190, 191 (D.C.1990) (en banc). We adopt as our own the Board's Report, appended hereto, and supplement it only with the following brief analysis.

Before the Board and the court, Mitrano's ultimate position has been that he honestly believed he was entitled to treat the $241,336.59 as his own because Michael J. Byorick, an officer of Dano, had endorsed the check over to him as legal fees for his representation of Dano in litigation with the District of Columbia.[1] Thus, as to the most serious violation found (Rule 8.4(b): the "criminal act" of theft), Mitrano's defense is essentially that he had a "claim of right" to the funds. *See* CRIMINAL JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA, No. 5.03 (2007 ed.); *Simmons v. United States,* 554 A.2d 1167, 1169 (D.C. 1989). If Mitrano held a "good faith belief," Instr. No. 5.03, that he was entitled

to the proceeds of the check, then he could not be found to have committed the crime of theft. *See, e.g., Richardson v. United States,* 131 U.S.App. D.C. 168, 170, 403 F.2d 574, 576 (1968) ("If the jury finds that the defendant believed himself entitled to the money, it cannot properly find that he had the requisite specific intent for [the larceny-based crime].")

That issue initially troubled us because of language in the Board's Report suggesting that its conclusion that Mitrano "stole the vast majority of the proceeds of the Dano check" (hence violated Rule 8.4(b)) may have rested in turn on a finding that it was *"unreasonable* for [him] to rely on the ... endorsement by Mr. Byorick" (emphasis added)—when an *unreasonable,* but honestly held, belief would preclude the finding of theft. *See id.* (citing *Morissette v. United States,* 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288 (1952), for the principle that "[a]n unfounded but genuine belief that the property taken had been abandoned negatives specific intent"). Reading the Board's Report as a whole, however, we are convinced that its—and the Hearing Committee's—finding of theft rested on the determination that Mitrano did not in fact believe he was entitled to all, or even the majority, of the proceeds of the check. The Committee's Report is replete with findings, for example, that Mitrano *"knew* that the amount of the check greatly exceeded the fees to which [his] retainer agreement [with Dano] entitled him and *knew* ... that others had an interest in the proceeds of the check" (emphasis added). The Board's conclusion that he "wrongfully took from others ... all the proceeds of the Dano check ... intend[ing] to deprive [them] of their right to that property and appropriated that property," is an unequiv-

---

1. *See generally Dano Resource Recovery, Inc. v. District of Columbia,* 620 A.2d 1346 (D.C. 1993).

ocal determination that he did not believe in good faith—genuinely or honestly—that he was entitled to all of the funds.[2]

Mitrano challenges the Board's repeated references to "others [besides Dano who] had an interest in the proceeds," including Williams Industries, which had loaned Dano funds during the litigation to continue its operations, and Frank Williams, Jr., President of both Dano and Williams Industries. Mitrano argues that he could not have wrongly taken—either by theft or misappropriation—funds of these "others" without clear and convincing evidence that they owned the check proceeds or had a "just claim" to them. *See In re Bailey,* 883 A.2d 106, 116–17 (D.C.2005) (distinguishing claims of a client from "third party claims"). But, regardless of the claim that others such as Williams Industries had to the money—whether by de facto ownership of Dano or "creditor" status that remained unproven—the record amply confirms that Dano itself owned the proceeds.[3] Although functionally insolvent at the time the check was issued, Dano still existed as a legal entity, with Frank Williams, Jr. as its president. Thus, the Board correctly states, "at the time [Mitrano] deposited the check," Dano "had a sufficient interest in the proceeds of the check to preclude [his] unilateral action to cash the check and retain the proceeds."

■ We deal, lastly, with Mitrano's claim that Bar Counsel leveled an unsupported charge of forgery against him, which (besides unfairly stigmatizing him) had the effect of misleading him in the preparation of his defense to the charges ultimately proven. Bar Counsel's Specification of Charges did not use the word forgery, and identified the criminal act being charged under Rule 8.4(b) as "theft." Nevertheless, paragraph 14 asserted that Mitrano had "endorsed the check" from the District in the name of "Michael J. Byorick, Pres," the implication being that he had done so falsely. On the basis of expert handwriting analysis that Mitrano adduced at the hearing, the Hearing Committee and the Board found that there was not "clear and convincing evidence … that [Mitrano] forged Mr. Byorick's name on the check."

For the reasons discussed by the Board, Mitrano's claim that the single-sentence assertion in the Specification that he had personally endorsed the check in another's name caused him to overlook—or underprepare to meet—the other serious charges including theft and intentional misappropriation is utterly without merit. At the same time, we agree with the Hearing Committee that particular "care [should be] exercised before the very serious charge of forgery [is] leveled against a member of the Bar," and that Bar Counsel would have been better-advised to investigate the signature issue further—perhaps through expert handwriting analysis of its

**2.** As the Board's Report reflects, there was abundant proof that Mitrano did not believe Byorick was authorized to sign over the whole of the proceeds to him as legal fees, beginning with Mitrano's own letter to Byorick in December 1997 stating that the District would soon issue a check to Dano of which Mitrano would "receive 10%" and that "there are expenses previously paid by others" that would be "due to them" from the proceeds. Mitrano's retainer agreement was explicit in limiting the fees he could earn over an initial

$60,000 to a percentage (beginning at 10%) of any recovery from the District.

**3.** As the Board pointed out, Dano won nothing in its litigation with the District; the check payable to Dano represented, instead, the difference between damages Dano was held to owe the District and money ($476,-242) which the District previously owed Dano but had refrained from paying during the litigation. The disbursed funds thus unequivocally belonged to Dano, less any funds Mitrano had rightfully earned.

own [4]—before asserting that Mitrano had falsified Byorick's endorsement on the check. But this does not relieve Mitrano of the consequences of his own actions.

Accordingly, respondent Peter Paul Mitrano is hereby ordered disbarred. As further recommended by the Board, reinstatement shall be conditioned on proof that he has made restitution to Dano Industries of the proceeds of the January 8, 1998 check, with interest from that date, less any amounts he can prove he was entitled to as of the date he received the check.

*So ordered.*

## *REPORT AND RECOMMENDATION OF THE BOARD ON PROFESSIONAL RESPONSIBILITY*

Respondent is charged, *inter alia*, with theft and misappropriation of a substantial check drawn to his client as the result of protracted litigation Respondent handled against the District of Columbia over a large business contract. Throughout the proceedings before Hearing Committee (the "Committee") Nine and the Board on Professional Responsibility (the "Board"), Respondent has asserted various procedural and substantive errors. After a three-day evidentiary hearing, and the submission of briefs, the Committee rejected Respondent's procedural arguments and found that Bar Counsel had proven by clear and convincing evidence, violations of seven disciplinary rules (including "theft," "dishonesty," and "misappropriation"). It has recommended disbarment. The Board agrees with the Committee's recommenda-

tions in toto. Additionally, we recommend full restitution by Respondent as a precondition to any future reinstatement.

## I. *PROCEDURAL HISTORY*

Bar Counsel commenced its investigation of Respondent by a July 6, 2001 letter to him which enclosed a June 6, 2001 written complaint about his handling of proceeds due his client—Dano Resource Recovery, Inc.—as the result of litigation with the District of Columbia. Due in great part to positions taken by Respondent on service of process and other investigatory papers, and the need for Bar Counsel to proceed in distant forums to obtain Respondent's bank records relevant to the investigation, the Specification of Charges herein was not filed until July 27, 2005. On November 1, 2005 and again on March 1, 2006, Respondent challenged whether he had been effectively served, although he acknowledged receiving the Specification of Charges [1] and filed his Answer to those Charges on March 3, 2006. On March 2, 2006, Respondent also filed additional motions, including (1) a complaint against Bar Counsel for making allegedly false allegations that he had "forged" an endorsement on the check at issue, and (2) a motion to dismiss for Lack of Proper Service.

Respondent filed further motions on April 13, 2006 for proposed discovery of two of the prospective witnesses against him. These motions were denied by the committee Chair for failure to meet the standards of Board Rule 3.2 ("compelling need" and lack of "undue burden").[2] A

---

**4.** *Cf. S.A. Auto Lube, Inc. v. Jiffy Lube International, Inc.,* 842 F.2d 946, 949 (7th Cir.1988) (citing with approval *Calloway v. Marvel Entertainment Group,* 111 F.R.D. 637, 646–47 (S.D.N.Y.1986) (failure to consult document expert when alleging forgery unreasonable for purposes of Rule 11 violation)).

**1.** *See* Hearing Committee Order dated February 3, 2006.

**2.** May 1, 2006 Order of Hearing Committee Chair.

prehearing conference attended by Assistant Bar Counsel and Respondent (*pro se*) was conducted by the Committee Chair on April 19, 2006. The evidentiary hearing took place on June 5, 6 and 8, 2006. Bar Counsel called five witnesses in its case in brief, including Frank E. Williams, Jr., the President of Dano (Respondent's corporate client) and Phillip C. Jones—Respondent's co-counsel during the protracted litigation before the Contract Appeals Board and District of Columbia Court of Appeals (the "Court"). Over Respondent's blanket objection, virtually all of Bar Counsel's exhibits were admitted. Respondent, appearing *pro se*, did not testify on his own behalf, and called one witness-a forensic document consultant. Respondent's exhibits were virtually all admitted, including those submitted within seven days of the hearing.[3] The Committee tentatively concluded that there had been violations of a number of rules[4] ("theft", "dishonesty", and misappropriation" among others), a lack of proof on two rules ("failure to keep client reasonably informed" and "unreasonable fee"), and no tentative decision on one rule ("failure to maintain complete records"). Tr. III at 181–83.[5] No evidence in aggravation or mitigation was offered. Tr. III at 182–83.

Bar Counsel submitted proposed findings of fact and conclusions of law on August 11, 2006, Respondent filed similar papers on September 5, 2006 and Bar Counsel filed a reply September 14, 2006. The Committee completed and filed its Report and Recommendation on February 9, 2007 to which Respondent filed exceptions and, on March 15, 2007 Respondent's Brief was filed with the Board. Bar Coun-

sel filed its Brief in support of the Hearing Committee Report on April 26, 2007 and Respondent filed his Reply on May 7, 2007. The matter was argued before the Board May 10, 2007: Assistant Bar Counsel, Traci M. Tait and Respondent (*pro se*) making the oral presentations.

## II. *FINDINGS OF FACT*

Respondent takes exception to many of the factual findings of the Committee. Bar Counsel supports the Committee's factual findings and conclusions. Committee findings of fact will be affirmed when supported by "substantial evidence on the record, viewed as a whole." Board Rule 13.7; *In re Micheel*, 610 A.2d 231, 234 (D.C. 1992) (citation omitted). We, of course, owe no deference to the Committee's determinations of "ultimate facts," such as whether the evidence establishes a violation of the Rules, and other conclusions of law. *Micheel*, 610 A.2d at 234; *In re Appler*, 669 A.2d 731, 739 (D.C.1995).

We find that the Committee's findings of fact are well written and amply supported by the record, and have adopted them with minor revisions. Pursuant to Board Rule 13.7, we have made one or two additional findings to provide context and further support for our conclusions.

1. Respondent is a member of the District of Columbia Bar, having been admitted on May 13, 1987 and assigned Bar number 410441. Bar Exhibit ("BX") A.

2. Dano Resource Recovery, Inc. ("Dano") contracted with the District of Columbia in 1982 to provide sludge and solid waste disposal services at the Dis-

---

**3.** Two large (four inch) notebooks of post-hearing exhibits were submitted by Respondent.

**4.** D.C. Rules of Prof'l Conduct R. 8.4(b)(c), 1.15(a)(b)(c), and 1.17(a).

**5.** The transcripts of hearings are designated: June 5, 2006 ("Tr.I"), June 6, 2006 ("Tr.II") and June 8, 2006 ("Tr.III").

trict's Blue Plains sewage treatment plant. BX 1 [6] at 5. That contract ultimately led to litigation before the District of Columbia Contract Appeals Board. *See* BX 1.

3. According to the Appeals Board, on March 3, 1982, the President of Dano, Frank E. Williams, Jr., ("Williams" or "Mr. Williams") executed the contract on behalf of the company. *Id.* at 5. The opinion further noted that on about May 6, 1982, Dano entered into a Washington D.C. Site Joint Venture Agreement with the Williams Group Limited Partnership, dividing the interests equally between them. *Id.* at 6. Williams Group Limited Partnership had both a general partner and limited partners. *Id.* at 6–7.[7]

4. Under the Joint Venture, Dano and the Williams Group Limited Partnership agreed that the Joint Venture would perform the work contemplated by the contract for *inter alia*, the handling and disposition of sludge, solid waste, and compost. *Id.* at 6. Pursuant to the Joint Venture Agreement the general supervision and management of the work was placed under the exclusive control of Williams Environmental, the general partner of Williams Group Limited Partnership (Dano's joint venture). *Id.* at 6.

5. In May 1983, the District terminated the contract pursuant to its default clause, asserting that Dano was in default. BX 1A at 41. In June 1983, Dano filed a notice of appeal challenging the District's termination. BX 1 at 8. In September 1983, Dano filed a complaint with the Contract Appeals Board. *Id.* Dano was subsequently notified by letter dated May 12, 1986 that the D.C. government sought the reimbursement of reprocurement costs as well as other costs from Dano, a determination Dano also appealed. *Id.* at 1 n. 3. Both appeals were consolidated. *Id.* at 2.

6. On August 30, 1983 Respondent wrote a letter to Williams Industries wherein he provided confidential legal advice regarding a potential legal claim Dano had against the District of Columbia. BX 4. This letter was labeled "Attorney–Client Work Product." *Id.* Two days later Respondent and Dano executed a retainer agreement for the prosecution of Dano's claim. BX 3, Tr. I at 92–93, 96–97 (Williams). The Agreement stated that Respondent would provide all legal representation for Dano in connection with the District's termination of its contract with Dano. BX 3. In return for performing these services Respondent was to receive $10,000 per month until $60,000 had been

6. BX 1 is the December 7, 1990 Opinion of the D.C. Contract Appeals Board in Dano Resource Recovery, Inc., CAB Nos. 686 & 743. Bar Counsel originally tendered only excerpts from this opinion, and one of Respondent's objections to this document was that it was incomplete. Tr. II at 453–54. The Committee then determined that the entire document should be received as an exhibit, rather than just the excerpts. Tr. II at 464. Nonetheless, the Exhibit as contained in the looseleaf of Bar Counsel's exhibits still contains only the excerpts, and for ease of reference the Committee and the Board have referred to the relevant page number as it exists in the looseleaf. We have continued that practice with respect to other exhibits where initially only excerpts were offered but ulti-

mately the entire document was introduced and admitted into evidence.

7. The general partner of Williams Group Limited Partnership was Williams Environmental Services, Inc. ("Williams Environmental"). BX 1 at 6. Williams Environmental, a wholly owned subsidiary of Williams Industries, (Tr. I at 208 (Williams)), had no ownership in the Williams Limited Partnership. BX 1 at 7. At the time, Mr. Williams was president of Williams Environmental. Tr. I at 81. One of the limited partners was Williams Industries, which held a 20% ownership interest in the Williams Group Limited Partnership. BX 1 at 7. At the time Mr. Williams was chairman and president of Williams Industries. Tr. I at 81 (Williams).

paid, any actual out of pocket expenses, ten percent of the first $13 million that Dano recovered, twelve percent of any sum over $13 million, fifty percent of any amount over $50 million and the $75,000 "presently due and owing" to Respondent for the past reinstatement of the contract. *Id.* at 1–2.[8] The Agreement was signed by Peter P. Mitrano and by Mr. Williams in his capacity as president of Dano. BX 3 at 3; Tr. I at 96–97 (Williams). As part of the Agreement, the Joint Venture guaranteed payment of all sums that are or may be payable to Respondent. BX 3 at 4. Signing on behalf of the Joint Venture was Mr. Williams, as Managing Director of Williams Group Ltd. Partnership and Michael J. Byorick as Dano's Representative. *Id.* Mr. Williams testified that by that time he had replaced Michael J. Byorick, Dano's former president and that Mr. Byorick had signed the retainer agreement "merely as [a] Dano representative." Tr. I at 98–99 (Williams).

7. After termination of the contract by the District in 1983, Dano was insolvent, "not liquid," and "essentially 'fundless.'" Tr. I at 93–94, 102 (Williams). With the approval of Mr. Williams in his capacity as president of Williams Industries, Williams Industries loaned Dano funds to continue its functioning. *Id.* at 94–95, 102–03 (Williams).

8. Williams Industries also provided in-kind assistance in the form of legal services by its general counsel, Phillip C. Jones, Esquire, as well as its law clerk, Daniel K. Maller, Esquire,[9] who was specifically hired to assist in the Dano litigation. Tr. I at 104–06 (Williams); 319–20, 325 (Maller). Mr. Jones was hired as Williams Industries' general counsel as a salaried employee in January 1986 and remained in that position until March/April 1995. Tr. I at 215–16 (Jones). Within 18 months of being hired, Mr. Jones obtained Mr. Williams' authority to act as Respondent's co-counsel on the Dano case. Tr. I at 104–06 (Williams), 217–22 (Jones). Based on the volume of work generated by the Dano litigation, Mr. Jones was to be compensated on a contingency basis in the event of a recovery in connection with the case. Tr. I at 218–19, 225 (Jones), 346 (Maller). Respondent was aware of this arrangement. *Id.* at 225–26 (Jones), 346 (Maller). Respondent and Mr. Jones, are both listed by the Appeals Board as appearing for Appellant Dano: "For the Appellant: Peter Paul Mitrano, Esq., and Phillip C. Jones, Esq." BX 1 at 1.

9. The hearing before the Appeals Board lasted 84 days. BX 1 at 2 n. 4; Tr. I at 223. Respondent's client was Dano; Bar Counsel stipulated that Respondent "never represented Williams Industries." Tr. I at 169; *see also, Id.* at 172–73.

---

**8.** Mr. Williams' understanding (Tr. I at 95–96, 153–54, 202–03 (Williams)) that the $75,000 mentioned in paragraph 3 was not distinct from the amounts owed pursuant to paragraph 2 appears to be at odds with the language of the retainer agreement. Mr. Mitrano represented (but did not testify) at the hearing that the $75,000 had not been paid and that amount owed to him was not subsumed within the amounts included in paragraph 2. Tr. II at 644–45. For our purposes this dispute is not relevant. Even considering the $75,000 as a separate amount owed to Respondent, the total of all sums due under the retainer agreement would not equal the

amount of the check ultimately deposited. Also, Respondent had already received his $60,000 in fees called for in the retainer agreement, during the litigation. Tr. I at 94 (Williams), Tr. II at 645 (Respondent's admission).

**9.** Mr. Maller worked continuously for Williams Industries since being hired in September 1988, even before graduating from law school. He is currently general counsel. Tr. I at 318–19, 320, 378–79 (Maller); *see also Id.* at 228 (Jones).

10. By this time, Dano was *totally dependent financially* on Williams Industries. *Id.* at 102–03 (Williams), 330–31 (Maller). During the litigation, Respondent received litigation costs and payment for his services through Mr. Williams, who obtained authorization from Williams Industries. Tr. I at 93–95 (Williams), 295–96 (Jones), 331 (Maller).

11. Because of its insolvency, Dano had no independent location or office. Respondent worked on the case from his home. *Id.* at 225 (Jones), 324, 358 (Maller). Dano had ceased to have Board meetings by the time Mr. Maller was hired in 1988. *Id.* at 357 (Maller). Consequently, from the inception of his representation of Dano in 1983, Respondent reported to Williams Industries, and specifically to Mr. Williams, who served as President of both Dano and Williams Industries. *Id.* at 99, 102, 104–05 (Williams), 232 (Jones), 332 (Maller). Mr. Williams authorized funding Dano and paying Respondent $60,000 in initial attorney's fees. Tr.1 at 93–95 (Williams). Respondent also reported to other corporate officers at Williams Industries and provided confidential written legal advice regarding the Dano litigation to Arthur V. Conover, III, who was then serving as Secretary–Treasurer and Chief Financial Officer for Williams Industries. BX 4; Tr. I at 107–09 (Williams), 332–33 (Maller).

12. Based on the District's position that Dano had defaulted on the contract between them, it had withheld payments from Dano in the amount of $476,242. BX 1 at 9; *see* Tr. I at 111, 205 (Williams). By order dated December 7, 1990, the Appeals Board decided Dano's appeal, finding that the District was entitled to receive $323,767 in damages from Dano for the cost of removal and disposal of Dano's compost material. BX 1 at 9. The Appeals Board calculated the difference between the amount withheld from Dano ($476,242) and the amount that Dano was liable for in damages ($323,767), and concluded that $152,475 was due and owing to Dano. *Id.* The Appeals Board also awarded Dano the difference at 4% interest per year from June 6, 1983 the date Dano had filed its notice of appeal. *Id.*

13. Further litigation and appeals ensued. Tr. I at 100, 105–06, 111 (Williams), 220, 230, 234, 236–37, 301 (Jones), 335 (Maller). The decision of the Appeals Board was affirmed by the District of Columbia Court of Appeals on February 23, 1993. BX 2 at 1. Along with one other attorney retained especially for the appeal, both Respondent and Mr. Jones are listed as representing petitioner Dano Resource Recovery, Inc. *Id.* at 3; Tr. I at 230–31.

14. Dano did not prevail on any aspect of the litigation. BX 1 at 10; BX 2 at 1, 17. It was entitled to money from the District only because the latter had withheld money otherwise owed to Dano. Tr. I at 110–11 (Williams).[10]

15. Williams Industries relied on Respondent to follow up with the District of Columbia government in order to obtain, on Dano's behalf, the refund check due the company. BX 9; Tr. I at 339 (Maller). From time to time representatives on behalf of Williams Industries made inquiries of Respondent about the proceeds due Dano. BX 9 at 2. Both Messrs. Jones and Maller inquired of Respondent regarding the status of the judgment, including the whereabouts of the proceeds. Tr. I at 241–44, 290–91 (Jones), 339–43 (Maller).

---

**10.** Neither the complainant nor Bar Counsel have raised the issue whether Respondent's retainer agreement contemplated that Respondent receive a percentage of the award under these circumstances.

Respondent often gave vague answers, then eventually failed to respond to their inquiries at all. *Id.* at 241–44, 290–91 (Jones), 340–343 (Maller). Respondent admits he failed to inform either Mr. Jones or Mr. Maller that the check had been received. Respondent's Proposed Findings at 33.[11]

16. On December 16, 1997, Respondent wrote Michael Byorick of Dano at an address in Spring Hill, Florida, addressing him as Executive Vice President. Respondent stated that he had been advised that "the District of Columbia will soon issue a check to Dano Resource Recovery, Inc. for the sum of $152,475.00 plus interest. . . ." BX 14C at 23. In this letter, Respondent sought to confirm that pursuant to his written fee agreement dated September 1983 "my fee for legal service is ten percent of said $152,475.00 or the sum of $15,247.50." *Id.* In this letter to Mr. Byorick, Respondent also acknowledged that others had a claim to a portion of the proceeds: "[T]here are expenses previously paid by others that are due to them." *Id.* The Record in this case contains no response to this letter. Mr. Byorick was deceased at the time of the hearing. Tr. I at 117 (Williams); Tr. II at 605. We do not even know if the letter was ever received.

17. On January 8, 1998, the District issued a check payable to the Order of "Dano Resource Recovery, Inc." in the amount of $241,336.59. BX 5.

18. Respondent caused the check to be deposited on January 14, 1998 in a New Hampshire bank: Account number 9358424917 at Fleet National Bank ("Fleet Bank") (now Bank of America) in the name of Peter Paul Mitrano at 6 Stevens Rd.,

Hanover, NH 03755. BX 7 at 1, 88–89; Tr. I at 38–39 (Limoli). At that time, the balance in Respondent's bank account was $87.59. BX 7 at 3.

19. The check bore the following endorsement in handwriting on the back:

Pay to the order to

Peter Mitrano

Partial Legal fee/[illegible] Expenses

Dano Recovery Inc.

Michael J. Byorick, Pres

BX 5.

20. On January 15, 1998, with the proceeds of the Dano check, Respondent paid the Internal Revenue Service $25,000. BX 7 at 19; Tr. I at 39–40. On the memorandum line Respondent wrote his own social security number. BX 7 at 19; Tr. I at 25, 40–41 (Limoli).[12] The check was not disbursed in connection with any of Dano's affairs. Tr. I at 121–22 (Williams); 349 (Maller). On January 16, 1988 (two days after depositing the Dano check) Respondent wrote the following additional checks (among others): Diners Club ($22,000), Chase Gold Visa ($10,480), MBNA America ($36,000), MBNA America ($10,700), Chevy Chase Bank ($15,200), Corestates Bank of DE ($12,000), Central Fidelity ($9,156.85), Citibank Ready Credit ($7,600), Household Finance Corp. ($6,900), Travelers Bank ($5,000), Crestor Bank ($6,197.94), Ford Credit ($2,183.20) and West Group Payment Ctr. ($6,248.12). BX 7. Other checks were likewise written by Respondent on this account for seemingly ordinary living expenses. BX 7, 8. None of these withdrawals were on behalf of Dano. Tr. I at 121–31 (Williams), 349–50 (Maller).

---

11. Respondent's Proposed Findings of Fact, Conclusions of Law and Recommendations ("Respondent's Proposed Findings"), filed September 5, 2006.

12. Edward Limoli is a Vice President for Bank of America, Northeast operations. Bank of America acquired Fleet National Bank. Tr. I at 18–20.

21. By January 30, 1998, the balance in Respondent's account had fallen to $11,992.34. BX 7 at 3. By February 20, 1998, the balance was $1,013.29. BX 8 at 2.

22. At no time did Respondent inform Mr. Williams or any other representative of Dano that he had received a check from the District of Columbia made out to Dano, or that he had deposited it into his own account. Tr. I at 112–13 (Williams). Respondent admits, in fact, that he did not inform Mr. Williams "that Dano Resource Recovery, Inc. received a check in January, 1998." Respondent's Proposed Findings dated September 5, 2006, at 35. Respondent did not disburse any funds to Dano or Mr. Williams as Dano's president or to Williams Industries or any representative thereof. BX 7, 8; Tr. I at 112–13, 119, 131–32 (Williams), 348–50 (Maller).

23. Because Respondent failed to inform any representative of Dano or anyone at Williams Industries, or his co-counsel Mr. Jones, about the status of the judgment from the District of Columbia, (Tr. I at 290 (Jones), 339–43 (Maller)), Mr. Williams' son and current president of Williams Industries (Frank E. Williams, III), filed a disciplinary complaint dated June 7, 2001 through Williams Industries—Mr. Jones. Id. at 244–45 (Jones); BX 9. There is no Bar complaint filed against Respondent in the name of Dano. Tr. I at 186–187 (Williams).

24. The letter of complaint requested the assistance of Bar Counsel in getting in touch with "our attorney" to find out whether the proceeds of a judgment had been paid and if so what happened to the money. BX 9 at 1. The letter claimed that Williams Industries had lost all contact with Mr. Mitrano and that in a recent telephone conversation between the company's former general counsel, Mr. Jones and Respondent, Mr. Mitrano refused to discuss the matter. Id. at 2.

25. On July 6, 2001 Bar Counsel wrote Respondent forwarding the June 7, 2001 letter of complainant and asking for a substantive response to each allegation of misconduct and to include all records reflecting deposit and disbursement of any check. BX 10 at 2, 13A at 2.

26. By letters dated July 16, 2001, Respondent replied. BX 11, 13B. His first letter repeatedly stated that he had represented Dano, not Williams Industries, Inc. BX 11 at 1, 5. He provided numerous supporting exhibits for that contention. His response said nothing about the check. But for claiming that he did not represent Williams Industries, Respondent did not address the contention contained in Mr. Williams' letter that Williams Industries was entitled to a portion of the proceeds of any check issued by the District of Columbia. He did acknowledge a brief telephone conversation with Mr. Jones in November 2000 and that he did not answer all of his questions at that time. Id. at 5. Respondent's second letter of July 16, 2001, transmitted certain financial information "under seal" because it was attorney-client privileged information. BX 13B at 10. Respondent did not disclose in these two letters to Bar Counsel that he had received, deposited and spent virtually all of the proceeds from the Dano check. BX 11.

27. In a letter dated July 8, 2001 [13] to Bar Counsel, Mr. Jones acknowledged that Respondent "in a technical sense" represented Dano and not Williams Industries. BX 12B at 2. He noted, however, that the

---

13. Apparently the letter is misdated and was really written and send on or around August 8, 2001. Tr. I at 315 (Jones).

Dano venture was organized by Mr. Williams and that after Dano's contract with the District of Columbia was terminated for default, virtually all of the participants in the venture went out of business. *Id.* at 2–3. Williams Industries provided all of the funds for the litigation with the District with the understanding that the first proceeds of any recovery, after any legal fees, would be applied to the company's advances. *Id.* Mr. Jones' letter asked again whether Respondent had collected the judgment and if so what had happened to the money. *Id.* at 3.

28. On September 27, 2001 Bar Counsel transmitted Mr. Jones' response to Respondent (BX 12B), and asked him to provide a written response within 10 days. BX 12A. Respondent did not timely respond. Bar Counsel on October 23, 2001 filed a Motion with the Board asking for an order compelling Respondent to respond to its written inquiry. BX 13. Respondent opposed Bar Counsel's Motion arguing that the complainant was not his client. BX 14B at 4–5. Respondent acknowledged that he "did receive payment for legal services from Dano Resource Recovery, Inc. The payment for legal services was deposited in Account No. 9358424917 at Fleet Bank. No payment for legal fees nor any other check was deposited in a trust account of the respondent related to this matter." BX 14B at 6. Respondent followed up on November 29, 2001, and filed further documents under seal. BX 14C. Thereafter, on November 30, 2001, Bar Counsel moved to dismiss its motion to compel a response stating that Respondent had substantially complied with its request for a written response. BX 15.

29. By letter dated January 27, 2003, Bar Counsel corresponded with Respondent summarizing difficulties it had experienced over the last year in serving interrogatories and a subpoena on Respondent

for financial records. BX 22A. Respondent replied by letter of February 1, 2003 again raising his argument that Williams Industries (the complainant) was not his client. BX 22 B. Bar Counsel thereafter proceeded through other avenues, including obtaining a court order in New Hampshire dated May 6, 2004 for issuance of a subpoena to Fleet Bank for production of bank records on Respondent's Account 93584–24917 for the period December 1, 1997 through February 1, 2003. BX 23 A–D. The New Hampshire Supreme Court Attorney Disciplinary Office assisted Bar Counsel in this effort. *Id.* Respondent opposed this elongated effort by motions to strike and to dismiss. BX 23D at 57. On June 18, 2004, Bar Counsel succeeded in obtaining the sought-after bank records of Respondent via a concurrent subpoena served on Fleet Bank in Massachusetts. BX 24 B.

30. On July 27, 2005, Bar Counsel filed the Specification of Charges against Respondent. BX B. Prominently featured in the Specification was the allegation (¶ 14) that Respondent had endorsed the check made out to Dano from the District of Columbia as follows:

Pay to the order to

Peter Mitrano

Partial Legal fee/[illegible] Expenses

Dano Recovery Inc

Michael J. Byorick, Pres

31. For purposes of this proceeding, the Committee accepted the fact that Mr. Byorick was in New Hampshire at or around the time the check was deposited. Tr. II at 632–34.

32. Respondent introduced the testimony of Ronald N. Morris-a forensic document consultant. Both Bar Counsel and the Committee accepted Mr. Morris as an expert in handwriting analysis. *Id.* at 520–21, 526. Mr. Morris described the

documents he had been given by Respondent for comparison purposes and the process he went through in examining the check. *Id.* at 530–33 (Morris). He testified that he found no evidence to indicate that Respondent wrote any of the questioned material on the back of the check and some evidence that, assuming the samples he had been given had been signed by Mr. Byorick, Mr. Byorick could have written the signature on the back of the check. *Id.* at 533–34 (Morris). His conclusions were tempered in part because he lacked the original of the check in question and had limited samples of Mr. Byorick's handwriting. *Id.* at 533, 552–54, 568–72, 580 (Morris). His conclusions about Mr. Byorick did not necessarily extend to the rest of the writing on the back of the check (*Id.* at 531–33 (Morris)) or the word "Pres" on the back of the check. *Id.* at 589 (Morris). Based on Mr. Morris' testimony the Hearing Committee found there was not clear and convincing evidence that the endorsement on the back of the check was done by Respondent. Bar Counsel conceded the point. Reply Br. of Bar Counsel, Sept. 14, 2006, at 15 n. 8. The Board agrees with the Committee's conclusion.

33. Respondent's position is that the entire amount of the check was for legal fees owed to him. Tr. II at 643–44.

34. The Committee found clear and convincing evidence that at the time the check was negotiated and deposited, Respondent had an insufficient basis to believe that Mr. Byorick had adequate authority to endorse the entire check over to him. The Board agrees.

a. Mr. Byorick had at one time, 10 to 15 years before the endorsement of the check, been President of Dano. Tr. I at 88, 99 (Williams); BX 11 at 25. Bar Counsel concedes that Mr. Byorick was president of Dano before Mr. Williams took over. Tr. II at 625.

b. Other than the word "Pres" on the endorsed check (of unknown origin) and one letter dated December 16, 1997, addressed and allegedly sent by Respondent to Mr. Byorick shortly before the check was negotiated and deposited (BX 14C at 23),[14] there was scant documentary evidence that Mr. Byorick was either president or executive vice president of Dano after the period November 18, 1982 to October 7, 1985. RX 37, 41; *see also* RX 26–36, 39.[15] Clearly, by the time of the September 2, 1983 retainer agreement, Mr. Byorick was no longer president of Dano. Tr. I at 99–102 (Williams). Mr. Williams was president by then and Respondent knew this. BX 3 at 3.

c. By the time of the litigation, Mr. Byorick was no longer a principal or officer of Dano, but only an employee. Tr. I at 226–27 (Jones). He participated at and was a witness in the litigation but did not have authority to bind the corporation contractually. *Id.* at 229 (Jones); *Id.* at 99 (Williams); *Id.* at 322–24, 328

---

14. Since Respondent never testified, and Mr. Byorick was deceased, the record has no evidence authenticating this December 16, 1997 letter.

15. Respondent introduced a deposition transcript from April 1986, where Mr. Byorick testified that while the work was proceeding on the Dano—District of Columbia contract (1982–83), he had endorsed a check made out to Dano and signed it over, interestingly enough to Williams—Washington, D.C. site Joint Venture, as an officer of Dano (RX 20A at 34), and another transcript before the D.C. Board of Contract Appeals where, in February 1989, Mr. Byorick refers to himself as the vice president of Dano. RX 20E at 9073.

(Maller). He was not remembered as having any role in the administration of Dano by this point. *Id.* at 314 (Jones). This was approximately 10 years prior to receipt of the check.

d. Despite the alleged endorsement on the check, Mr. Byorick was not President of Dano in January 1998. Tr. I at 114 (Williams). Nor was he Executive Vice President at that time. *Id.* at 115. Mr. Byorick had moved to Florida, had no office or position with Dano and had no authority to bind Dano. *Id.* at 114; Tr. I at 327–28, 344 (Maller). Mr. Maller, as General Counsel for Williams Industries, had possession of the corporate records of Dano and was aware of no change in the corporate structure that would cast doubt on the fact that Mr. Williams was President of Dano. Mr. Byorick had no official role at the time the check was endorsed. Tr. I at 329–33 (Maller). Indeed, Mr. Maller had never even met Mr. Byorick and Mr. Maller had been affiliated with Williams Industries since 1988. Tr. I at 323. (Maller) Although Dano is insolvent, it remains a corporation to this day. *Id.* at 99 (Williams).

35. In sum, at the time Respondent deposited the check, Frank Williams, Jr., was President of Dano. Tr. I at 99, 101–02, 114–16 (Williams), 321 (Maller). Dano, Williams Industries, and others had a sufficient interest in the proceeds of the check to preclude Respondent's unilateral action to cash the check and retain the proceeds. The Committee found credible evidence and the Board agrees that:

a. Mr. Williams provided financial backing to Dano and over the years became more involved in Dano, became chairman of the Board of Dano, and essentially managed the company through most of the project with the District. Tr. I at 84, 86 (Williams); BX 11 at 26. Williams Industries was generally the source of any financial support for Dano and the litigation. Tr. I at 331 (Maller). During the course of the contract, Mr. Williams personally guaranteed payment to cover debts incurred by Dano and ultimately paid $550,000 to a subcontractor. BX 1 at 6–7; Tr. I at 103, 160–62 (Williams); *Id.* at 235 (Jones).

b. Williams Industries had to pay the monthly fees and expenses due Respondent under the retainer agreement because Dano had no funds to do so. Tr. I at 94–95 (Williams). Respondent also knew that money to fund the litigation came from Williams Industries and Frank Williams, Jr. *Id.* at 295–296 (Jones).

c. Respondent's 1983 retainer agreement was signed by Mr. Williams as President of Dano. BX 3 at 3. The agreement was guaranteed by the Joint Venture as reflected by Mr. Williams' signature as Managing Director for one joint venture partner and Mr. Byorick's as Dano's representative. BX 3 at 3–4; Tr. I at 98–99 (Williams). At the time of the retainer agreement, Mr. Williams was involved in running Dano. He was President of Dano and had the authority to bind Williams Industries and make decisions on its behalf. Tr. I at 102 (Williams).

d. At the time of the litigation Mr. Williams remained President of Dano. *Id.* at 227 (Jones), 321 (Maller). Subsequent to 1983, Dano's activities were controlled by Mr. Williams. *Id.* at 328 (Maller). Re-

spondent reported directly to Mr. Williams and kept him apprised of the legal work that he was doing for Dano. Tr. I at 104–105 (Williams), 332 (Maller). On August 30, 1983, Respondent provided his views about the potential success of the litigation to Arthur Conover, then Secretary–Treasurer of Williams Industries. BX 4; Tr. I at 108–109 (Williams), 332–33 (Maller).

e. There was an understanding among those participating in the Blue Plains project that if there was a recovery on the part of Dano in the litigation, Williams Industries would be reimbursed any monies advanced towards the litigation and there would be some sort of pro rata distribution to others who were owed money from the project. Tr. I at 209 (Williams), 234–236 (Jones), 336–337 (Maller). In addition, Williams Enterprises, which was 100% owned by Williams Industries, was one of the many subcontractors on the job that was still owed money and had filed a monetary claim against Dano. BX 11 at 7–15; Tr. I at 159–160, 208, 211 (Williams), 248–249 (Jones). Respondent was generally aware of these arrangements (Tr. I at 210 (Williams), 247–49 (Jones)) and that others had claims to some of the proceeds from the check. *Id.* at 344–48 (Maller).

f. Mr. Jones, based on his legal work as Respondent's co-counsel in connection with the litigation, also had an interest in a portion of any funds recovered on behalf of Dano. Tr. I at 218–19 (Jones). Respondent was aware of Mr. Jones' interest. *Id.* at 225–26, 247–48 (Jones).

36. Respondent demonstrated that he did not likely forge the endorsement on the check, that his client was Dano and not Williams Industries, that Mr. Byorick had at one time held a position of authority at Dano and was involved in the litigation. Respondent offered no evidence, however, substantially challenging Mr. Williams' role as President of Dano, his primary role in running the company, Dano's reliance on Williams Industries for general financial support, Williams Industries' financial support of the litigation against the District, Mr. Jones' role in the litigation and his compensation arrangement, or the fact that Respondent reported to Mr. Williams as President of Dano and other Williams Industries officials about the litigation and not to Mr. Byorick. Nor did he offer any evidence that he was entitled to receive attorney's fees in excess of those enumerated in his retainer agreement, which were significantly less than the check received and deposited into his bank account in January, 1998.

## III. CONCLUSIONS OF LAW

The Committee initially addressed a number of preliminary matters raised by Respondent. The Board follows the same format adopting much of the Committee's written product.

### A. Service of the Specification of Charges and Petition

■ Prior to the hearing, Respondent raised the issue of whether he had been properly served with the Specification of Charges and Petition Instituting Formal Disciplinary Proceedings. Respondent argues that formal disciplinary proceedings are instituted by the filing of a Petition which must be served upon the Respondent (D.C. Bar R. XI, § 8(c)), and that service must be either personal or by registered or certified mail. D.C. Bar R. XI, § 19(e). In support of his motion, Respondent has cited numerous federal decisions

finding various federal tribunals lacked jurisdiction over an individual who had not been properly served, and that proof of actual notice of the proceedings neither cured deficient service nor conferred jurisdiction. In those cases, the act of service, in strict compliance with the applicable service rule, was part and parcel of the tribunal acquiring jurisdiction over the individual.

As stated in the Committee Report, an attorney before the disciplinary authorities of a Bar to which the attorney belongs stands on a different footing than a defendant being brought before a federal tribunal as in the cases cited by Respondent. Bar Counsel notes that pursuant to rules duly promulgated by the District of Columbia Court of Appeals, "[a]ll members of the District of Columbia Bar ... are subject to the disciplinary jurisdiction of [that] Court and its Board on Professional Responsibility...." D.C. Bar R. XI, § 1(a). In essence, it is the Rule rather than service that provides for jurisdiction of the Board and its Hearing Committee over a D.C. licensed attorney. Accordingly, and in light of Respondent's actual notice, the Board concludes that Respondent's motion to dismiss for lack of service should be denied.

## B. *Complaint Against Bar Counsel*

Prior to the hearing, at the hearing, and on appeal to the Board, Respondent has complained that Bar Counsel and Assistant Bar Counsel lacked any good faith factual basis for charging Respondent in essence with the forging of Mr. Byorick's signature on the back of the check. Resp't's Brief, dated March 15, 2007 at 2–12. Both the Hearing Committee and the Board have determined that there is a lack of clear and convincing evidence to conclude that Respondent forged Mr. Byorick's name on the check. But the charge was not made in isolation. As set forth in the Committee Report, the assertion in the charges was only made after Bar Counsel received what certainly appeared to be credible allegations from long-standing D.C. businessmen and lawyers that they had never received any proceeds from a check in which they claimed to have an interest, and where their requests for information about that check from Respondent had been met with what at most charitably could be described as stonewalling. When in light of those allegations Bar Counsel determined through investigation that the check in issue had been deposited into Respondent's personal bank account, without notice to his client, and virtually all the money had been spent by Respondent on personal matters within three weeks, we cannot say leveling an allegation that the endorsement had been forged was beyond what a prosecutorial official might reasonably charge. Disciplinary petitions by Bar Counsel are based on probable cause, not the clear and convincing level of proof necessary to prove a violation. *See* Board Rules 7.1 and 11.5.

## C. *Admissibility of Evidence*

■ *Bar Counsel's Exhibits*—Respondent objected to Bar Counsel's introduction of such evidentiary items as his own Bar Registration Statement (Tr. II at 440–41), his own letters to Bar Counsel in response to Bar Counsel's invitation to respond to the complaint against him (Tr. II at 490, 494), Bank of America records relating to an account he maintained (Tr. I at 31–32), and decisions of the District of Columbia Board of Contract Appeals (BX 1) and the District of Columbia Court of Appeals (BX 2). Tr. II at 453–54, 463–67. He generally raised a due process objection to Bar Counsel's exhibits arguing both that some of the statements in the proposed exhibits were hearsay or that they contained material that went beyond the

Specification of Charges. Board Rule 11.3 provides that non-cumulative evidence that is relevant and not privileged shall be received by the Committee and given such weight as the Committee deems appropriate. It also provides that the Committee should be guided, but is not bound, by formal rules of evidence. Board Rule 11.3. Additionally, Bar Counsel offered the testimony of one of the secretaries from her office describing the normal office procedures and policies with respect to correspondence and documents to and from that office. Tr. III at 4–112 (Spears). Bar Counsel also offered the testimony of a Bank of America official with respect to the production of the bank records relating to Respondent's account at that institution. Tr. I at 18–76 (Limoli). The Committee correctly ruled on the admission of these exhibits.

*Respondent's Exhibits*—Despite Respondent's vigorous complaints about the insufficiency of Bar Counsel's foundation for her exhibits, he did even less in complying with the rules with regard to the submission of evidence and in attempting to authenticate his exhibits. For example, certain of his exhibits pertaining to the exemplars of Mr. Byorick's signature used by his handwriting analyst although identified for the record, were never in fact even tentatively accepted into the record. The Committee left it open to Respondent to introduce at least some minimal evidence of the reliability of those exemplars (Tr. II at 607–614), an opportunity he never availed himself of. Nonetheless, since the Committee was provided no basis to believe that the exemplars of Mr. Byorick's signature (RX 1C at 1–2, 1D) were anything but what they purported to be (Tr. II at 606–07), it deemed Respondent's Exhibits 1C at 1–2 and 1D1—1D8 admitted.

Respondent also submitted within seven days of the close of the hearing, pursuant to Board Rule 12.1(c) and the Committee's ruling (Tr. III at 177–180, 184), Exhibits 21–46. Although Bar Counsel objected at the hearing to the record remaining open without limitation as to subject matter (Tr. III at 177–79), it does not appear that Bar Counsel lodged a specific objection to Respondent's Exhibits 21–46, and the Committee determined to admit them into evidence. The Board agrees with the Committee's handling of the admission of evidence.

### D. *The Significance of Respondent's Allegations of Not Representing Williams*

■ Respondent maintained throughout the disciplinary proceedings that there is no proper complainant against him. Respondent's argument is premised on the assertion that he was retained by Dano, not Frank Williams, Jr., nor Williams Industries (or any other Williams entity). Indeed Bar Counsel has stipulated that Respondent represented Dano and not Mr. Williams nor Williams Industries. It was Williams Industries and Frank E. Williams, III in his capacity as President of Williams Industries, Inc. that filed the complaint against Respondent. Dano has not filed such a complaint, although a complaint surely could have been filed in Dano's name.

The Committee rejected the argument and the Board does likewise. Under D.C. Bar R. XI, § 6(a)(2), Bar Counsel has the power and duty "[t]o investigate all matters involving alleged misconduct by an attorney subject to the disciplinary jurisdiction of [the] Court which may come to the attention of Bar Counsel ... *from any source whatsoever*, where the apparent facts, if true, may warrant discipline." (emphasis supplied). Frank Williams, Jr. and Williams Industries are certainly no strangers to the allegations against Re-

spondent; in fact, they are central to them. Frank Williams, Jr. had been President of both Williams Industries, Inc. and Dano by the time Respondent was retained; indeed he signed Respondent's retainer agreement as president of Dano setting forth Respondent's fee. BX 3 at 3–4. Dano no longer existed as a viable entity at the time the check was issued in 1988 in this case, but, to the extent that it was still a legal entity, Mr. Williams was its President. Mr. Williams and Williams Industries had substantially financed the litigation against the District and there was a common understanding that they would be reimbursed from the proceeds, if any, of that litigation. Thus, we find that Williams Industries, as represented by its now current president, Frank E Williams, III, and Frank E. Williams, Jr., the current president of Dano and the former president of Williams Industries, had a sufficient basis to press the complaint against Respondent, and Bar Counsel had the power and duty under D.C. Bar R. XI, § 6(a)(2), to investigate the charges.

E. *Respondent's Due Process Claims*

Respondent, throughout the hearing and since, has raised a number of due process arguments. First, Respondent argued vigorously that the Specification of Charges merely charged him with forgery (Tr. II at 640) and not that he deposited a check endorsed by someone who lacked authority to do so. Respondent argues that Bar Counsel's case against him evolved to the point that he was being tried for matters that were not within the Specification of Charges filed against him, and he, therefore, has been denied due process as a matter of law and, alternatively, justifies why he did not have other

witnesses prepared and available to testify at the time the hearing began. Tr. III at 133–38. Second, Respondent claims that he was denied due process because he was given insufficient time to present his case, particularly in light of his claim that the charges against him had shifted. We deal with each of these matters in turn.

■ *The Scope of the Charges Against Respondent*—The clear import of Bar Counsel's charges against Respondent was that he was not entitled to the proceeds of the check; that someone else and another company was entitled to at least some portion, if not most, of the proceeds. The Specification of Charges uses the phrase "theft." To be sure, Bar Counsel prominently alleged that forgery by Respondent was the method used to accomplish this theft and misappropriation,[16] but the forgery charge was merely a part of the charges against Respondent.

As set forth in the Committee Report, the Specification of Charges against Respondent included the following factual allegations:

a. Respondent reported to Williams Industries which was funding Dano and paying Respondent's attorney's fees and Respondent provided confidential written legal advice regarding the Dano litigation directly to officers of Williams Industries. BX B at 3.

b. When Respondent received the check he did not notify Mr. Williams or anyone at Dano or Williams Industries. *Id.* at 4.

c. Respondent deposited the check into a business account at Fleet National Bank Account in New Hampshire: an account in his name that did not

---

**16.** The charges refer to Respondent's endorsement of the check including Mr. Byorick's signature. BX B ¶ 14.

include the words "trust account" or "escrow account." *Id.*

d. Mr. Williams in his capacity as Dano's president inquired periodically of Respondent from the late 1980's through June 1998 about the status of the litigation, including the proceeds of the judgment. *Id.* at 6. The general counsel for Williams also made regular and periodic inquiries to which Respondent gave vague, and eventually, no answers. *Id.* At no time did Respondent inform either person that he had "received, deposited and disbursed" virtually all of the $241,336.59 "for his own purposes." *Id.*

e. Because Respondent refused to inform Dano's president or anyone at Williams Industries about the status of the judgment from the District of Columbia, the present disciplinary complaint was filed. *Id.* at 7.

f. Respondent violated various D.C. Rules of Professional Conduct because he, *inter alia*, "engaged in conduct involving dishonesty, deceit, fraud and/or misrepresentation," "committed a criminal act (theft)," "intentionally and/or recklessly misappropriated funds belonging to his clients/third persons," engaged in "commingling," "failed . . . to deliver funds to . . . third persons . . . [who] were entitled to receive [them]." *Id.* at 8.

Respondent surely knew that he had received inquiries from representatives on behalf of the Williams' interest about the proceeds of the check and that he had evaded those inquiries. Moreover, the written record of this disciplinary proceeding (complainant's letters for example) prior to the hearing, made quite clear that others were asserting an interest in the check and that they, rather than another individual such as Mr. Byorick, had the right to control disposition of at least a portion of the check's proceeds. It should have been quite clear to Respondent that his right to the entire proceeds of that check was to be placed in issue by Bar Counsel. As stated in the Committee Report, to the extent that Respondent "prepared his case on the assumption that forgery (rather than issues such as his right to retain the entire proceeds of the check) was the sole charge against him, that was a serious mistake on his part." H.C. Report at 29.[17]

 *The Conduct of the Hearing*—To the extent that Respondent has argued that he needed more time during the course of the hearing because the hearing was proceeding in a direction that was not foreshadowed in the charges against him or that he could not anticipate, for the reasons stated immediately above, the Committee rejected that contention and we do also.

Similarly, we agree with the Committee's rejection of Respondent's contention that the hearing was conducted unfairly and unduly favored Bar Counsel. The Chair had informed Respondent at the pre-hearing that there would not be 4 or even 2 weeks of hearing dates as Respondent originally requested. The Chair set aside two days and said the Committee would then see if more time was necessary. Prehr'g Tr. at 12–13. Once the hearing began, Respondent seemed to be

---

17. Additionally, Bar Counsel argues and we agree that since the question of Mr. Byorick's authority was in the nature of an affirmative defense (in fact one that Respondent did not raise at any point during the pre-hearing proceedings), that there was no need for the Specification of Charges specifically to allege that Mr. Byorick lacked authority to endorse the entire check over to Respondent and allow him to retain all of the proceeds.

trying to unreasonably extend the proceedings with what appeared to be irrelevant questioning. *See, e.g.,* Tr. I at 45–73,145–47; Tr. III at 51–57. Respondent provided a witness list including 70 names (without the courtesy of identifying either their affiliation or contact information), and when asked at the outset of the hearing whom he actually intended to call during the course of the hearing, initially declined to say (Tr. I at 10–12), and at the end of the first day identified only Mr. Morris. *Id.* at 385–89. Even on the second day of the hearing, when it was clear that his case was to be put on, Respondent had not one witness available to testify beyond his forensic expert Mr. Morris. Tr. II at 615–18; Tr. III at 163. At that point he only reluctantly identified additional witnesses he intended to put on if the hearing were to be extended (Tr. II at 616–18, 628–30, 648–51), and although the hearing was extended to a third day he had no witnesses available to put on that day. Nonetheless, the Committee allowed Respondent to make a proffer about whom would be called if the hearing were to be extended again, yet that proffer suggested that their testimony would be largely irrelevant. Tr. III at 166–70. The Chair attempted to strike a balance between allowing Respondent to present his case in the manner of his choice and moving the proceedings along to focus on factual disputes in issue. *See, e.g.,* Tr. I at 53–60, 137, 142; Tr. III at 54–55. The Board agrees with the Chair's handling of these issues.

### F. *The Merits*

The Board agrees with the Committee on the lack of clear and convincing evidence that Respondent personally wrote the endorsement on the check that includes Michael Byorick's name and title. There is some, but not much, evidence in the record to support the position that Mr. Byorick actually endorsed the check.[18] Nonetheless, for purposes of determining whether Respondent violated any of the Rules which he is charged with violating, we assume, as did the Committee, that Mr. Byorick did in fact endorse the check.

In light of that holding, we must determine whether Respondent could reasonably rely on Mr. Byorick's endorsement to permit him to negotiate and deposit the check in question as totally his own. Legally this turns in large measure on Mr. Byorick's authority at the time the check was endorsed and negotiated. In turn, the authority question turns on the facts adduced at the hearing and in the documentary record concerning Mr. Byorick's and Mr. Williams' roles in Dano at varying times.

There is clear and convincing evidence that at the time the check was received and deposited by Respondent (1998), Mr. Byorick was no longer with Dano but had retired to Florida. He had no authority on behalf of Dano to negotiate and/or endorse the check over to Respondent, and Respondent had no basis to believe that Mr. Byorick had such authority. We accept that Mr. Byorick was at one time president of Dano. It is also true that Mr. Byorick attended and was a witness before the Contract Appeals Board. In addition, there are documentary references attesting to Mr. Byorick's title with Dano in the years between 1982 and 1985, and two brief transcript references where Mr. Byorick refers to himself as an officer of Dano as late as 1986 and 1989. Notwith-

---

**18.** That "evidence" consists of the testimony of Ronald Morris that suggests a weak probability that Mr. Byorick endorsed the check (Tr. II at 534), and Respondent's representation and Bar Counsel's stipulation that Mr. Byorick was in New Hampshire at or about the time the check was endorsed and negotiated. *Id.* at 632–34.

standing these references, however, we believe there is clear and convincing evidence that, as of the date of the 1983 retainer agreement with Respondent and throughout the litigation, Mr. Byorick had ceased to be an officer, or principal of Dano, and had no managerial responsibility to enter into contracts on behalf of Dano.

Most significantly, however, and despite Respondent's alleged letter to Mr. Byorick of December 16, 1997, referring to him as Executive Vice President (BX 14C at 23), and the unauthorized endorsement on the back of the check referring to Mr. Byorick as "Pres", we find there is clear and convincing evidence that by the time the letter was allegedly written to Mr. Byorick, and the check was issued by the District to Dano, Mr. Byorick was living in Florida and had no position with Dano. In fact, this is confirmed by all the evidence, which points in a different direction—that is that Mr. Williams, not Mr. Byorick, had authority with respect to the proceeds of the check. The check was made out to Dano. At the time Respondent deposited the check, Frank Williams, Jr. was President of Dano. Both Mr. Williams and Williams Industries had provided financial backing to Dano over the years, were the moving force behind Dano, and Mr. Williams essentially managed the company through most of the project with the District. Respondent's retainer agreement had been signed by Mr. Williams as President of Dano and, as Respondent surely knew, his monthly retainer fees and expenses were paid by Williams Industries during the litigation, and he reported on the litigation directly to Mr. Williams and other Williams Industries' officials—not to Mr. Byorick.

Finally, pursuant to the retainer agreement Respondent was entitled to at most approximately $100,000 (ten percent of the $241,336.59 check to Dano and $75,000 pre-viously due and owing). Respondent knew that the amount of the check greatly exceeded the fees to which the retainer agreement entitled him and knew, as his letter of December 16, 1997 states, that others had an interest in the proceeds of the check. BX 14C at 23. It was generally understood and Respondent knew that if there was to be a recovery on Dano's behalf that Williams Industries Inc. would be reimbursed monies advanced toward the litigation and that there would be a pro rata distribution to others who were owed money from the project or the litigation. He knew that those connected with Williams' interest were inquiring about the check and that he had evaded providing direct responses. Respondent offered no evidence that he was entitled to receive as attorney's fees amounts in excess of what was stated in his retainer agreement. In sum, it is clear to us that under the totality of circumstances it was quite unreasonable for Respondent to rely on the purported endorsement by Mr. Byorick, even assuming there was such an actual endorsement, or to cash and retain the proceeds of the check, without consulting with anyone with ties to either Mr. Williams, the President of Dano, or Williams Industries. Indeed, Respondent had no basis for his actions concerning the check.

## IV. *ANALYSIS*

The Board adopts with minor alteration, the well written analysis of rule violations set forth in the Committee Report.

### A. *Rule 8.4(b)*

Rule 8.4(b) declares that it is professional misconduct to "commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer ..." Comment 1 provides that "[m]any kinds of illegal conduct reflect adversely on fitness to practice law, such as offenses

involving fraud.... [A] lawyer should be professionally answerable only for offenses that indicate lack of those characteristics relevant to law practice. Offenses involving ... dishonesty, breach of trust ... are in that category."

Under the Court's ruling in *In re Gil*, 656 A.2d 303, 305 (D.C.1995), we may look to the law of any jurisdiction that could have prosecuted Respondent for the misconduct to determine whether a lawyer's conduct is a "criminal act" under Rule 8.4(b). We agree with Bar Counsel that we may look to the law of the District of Columbia,[19] the jurisdiction that issued the check and where the legal proceeding that gave rise to the issuance of the check took place, the law of New Hampshire [20] where the check was negotiated and deposited, and the law of Virginia,[21] where Dano, Williams Industries, Inc (as a party with an interest in the check) and Respondent maintained offices.

We have little doubt that Respondent's conduct violated the laws of all three jurisdictions. Respondent wrongfully took from others, all the proceeds of the Dano check, which amounted to $241,336.59. He intended to deprive those others of their right to that property and appropriated that property. He refused to disclose to parties with an interest in the check the fact that he had received the check, and he spent virtually all of the proceeds within weeks of receiving them. The evidence is clear and convincing that Respondent exercised control over the funds and possessed the intent to permanently deprive others of their share of the funds. Even if we accepted Respondent's claim to a share of the check in payment of his attorney's fees, the clear and convincing evidence demonstrates that Respondent stole the vast majority of the proceeds of the Dano check in violation of rule 8.4(b).

## B. *Rule 8.4(c)*

Rule 8.4(c) provides that "[i]t is professional misconduct for a lawyer to: ... (c)

---

**19.** "In the District of Columbia, a person commits the crime of theft 'if that person wrongfully obtains or uses the property of another with intent: (1) To deprive the other of a right to the property or a benefit of the property; or (2) To appropriate the property to his or her own use or to the use of a third person.' " *In re Slattery*, 767 A.2d 203, 212 (D.C.2001), *citing* former D.C.Code § 22–3811(b) (The statute defining "Theft" was renumbered D.C.Code § 22–3211(b)). The term "wrongfully obtains or uses" means (1) taking or exercising control over property; (2) making an unauthorized use, disposition, or transfer of an interest in or possession of property; or (3) obtaining property by trick, false pretense, false token, tampering, or deception. D.C.Code § 22–3211(a) (2001) *formerly* D.C.Code § 22–3811(a) (1981). The term "wrongfully obtains or uses" includes, *inter alia*, conduct previously known as larceny. Thus "[i]n the District of Columbia, the crime of larceny is embodied in the statutory offense of 'theft.' " *Gil*, 656 A.2d at 305 n. 6.

**20.** In New Hampshire, "[a] person commits theft if he obtains or exercises unauthorized control over the property of another with a purpose to deprive him thereof." N.H. RSA § 637:3–1 (1973). "As used in this section ... 'obtain or exercise unauthorized control' includes but is not necessarily limited to conduct heretofore defined or known as common law ... larceny by conversion, ... and embezzlement." N.H. RSA § 637:3–II (1973).

**21.** In Virginia, "[l]arceny, a common law crime, is the wrongful or fraudulent taking of another's property without his permission and with the intent to deprive the owner of that property permanently." *Tarpley v. Commonwealth of Virginia*, 261 Va. 251, 256, 542 S.E.2d 761, 763 (2001) (citations omitted). "[U]nder Code § 18.2–95, grand larceny includes the taking, not from the person of another, of goods that have a value of $200 or more." *Tarpley*, 261 Va. at 256, 542 S.E.2d at 763–64 (This Virginia Code section was in effect at the time that Respondent deposited and spent the check. Va.Code Ann. § 18.2–95 (2006)).

engage in conduct involving dishonesty, fraud, deceit, or misrepresentation; . . ." A variety of conduct has been found to violate the rule. *See, e.g., In re Rogers,* 902 A.2d 103 (D.C.2006) (Respondent took advantage of his position as a lawyer and personal friend of an elderly woman to take possession of cash and assets worth more than $260,000 which he then used for his own purposes); *In re Sandground,* 542 A.2d 1242, 1243 (D.C.1988) *(per curiam )* (assisting a client in divorce case to conceal assets).

■ "[T]he term 'dishonesty,' while encompassing fraud, deceit, and misrepresentation, also includes 'conduct evincing a lack of honesty, probity or integrity in principle; a lack of fairness and straightforwardness.' " *In re Cleaver–Bascombe,* 892 A.2d 396, 404 (D.C.2006) *(quoting In re Shorter,* 570 A.2d 760, 767–68 (D.C. 1990) (per curiam)). There can be little doubt given our conclusion that Respondent stole at least a large portion of the Dano check in violation of Rule 8.4(b), that we similarly conclude that he engaged in conduct that involved dishonesty in violation of Rule 8.4(c). The Committee so concluded, and the Board does as well.

### C. *Rule 1.15(a)*

Rule 1.15(a) describes a lawyer's duties with respect to holding the property of a client and other persons. It provides: "A lawyer shall hold property of clients or third persons that is in the lawyer's possession in connection with a representation separate from the lawyer's own property. Funds shall be kept in a separate account. . . ."

■ Misappropriation is defined as "any unauthorized use of client's funds entrusted to [a lawyer], including not only stealing but also unauthorized temporary use for the lawyer's own purpose, whether or not [he] derives any personal gain or benefit therefrom." *In re Alexander,* 865 A.2d 541, 543 (D.C.2005) (citations omitted). Misappropriation is often proven by examining the account records of the financial institution in which the attorney has deposited client funds. Once the balance in the account falls below the amount owed to the client or a third party, misappropriation occurs. *See In re Harrison,* 461 A.2d 1034, 1036 (D.C.1983).

■ Respondent clearly did not notify Dano's authorized representative, or any other third party with an interest in the proceeds of the check, that the check had finally been issued. He did not deliver any portion of the funds to the authorized representative of Dano or any other person with an interest in the proceeds. Respondent did not dispute that he deposited the check issued to Dano into his personal business account and used all of the funds for his own purposes. The balance in the account clearly fell to a level below the amounts he owed to Dano and others. Respondent's theft of the funds clearly constituted a misappropriation of the funds. Intentional or reckless misappropriation requires a showing that Respondent handled the entrusted funds "in a way that reveals either an intent to treat the funds as . . . [his] own or a conscious indifference to the consequences of his behavior for the security of the funds." *In re Fair,* 780 A.2d 1106, 1109–10 (D.C.2001) (citation omitted). The record in this case establishes by clear and convincing evidence that Respondent treated the proceeds of the check issued to Dano as his own and that his misappropriation was intentional.

■ Respondent also engaged in commingling, a violation the Court takes very seriously, "One of the most basic rules of fiduciary conduct is that the fiduciary must not commingle his own property with that held by him belonging to another. In

particular, fiduciary funds must be kept separate and deposited in a special account." *In re Hessler*, 549 A.2d 700, 700 (D.C.1988); *see also In re Berryman*, 764 A.2d 760, 767 (D.C.2000) (quoting *Hessler*, 549 A.2d at 702). Respondent violated the ban on commingling when, without sufficient authority, he deposited the check made out to Dano on January 14, 1998, into his own account. Respondent breached his fiduciary obligation—to his client Dano and third parties with an interest in the funds—when he failed to hold separate from his own funds those funds belonging to others, thus engaging in commingling in violation of the Rule.

### D. *Rule 1.15(b)*

Rule 1.15(b) requires an attorney to notify the client or other interested person of the receipt of funds to which they are entitled and to render a prompt accounting of any monies he had received. *In re Midlen*, 885 A.2d 1280, 1289–90 (D.C.2005). Respondent did not promptly notify any authorized representative of Dano or any other party with an interest in the funds when he received them from the D.C. Government. Although Respondent did notify Mr. Byorick about receipt of the check (BX 14C at 23), the evidence clearly demonstrates that at the time the check was received, Mr. Byorick had long since ceased to be involved with Dano. Therefore, notice to Mr. Byorick did not fulfill Respondent's obligation pursuant to this Rule. Moreover, Respondent clearly did not deliver to the client (Dano) or any authorized representative of the client (then Dano president, Mr. Williams), or any third party entitled to receive the funds or a portion thereof, any portion of the funds. Respondent has, therefore, violated this Rule.

### E. *Rule 1.15(c)*

Rule 1.15(c) provides that when "a lawyer is in possession of property in which interests are claimed by the lawyer and another person, ... the property shall be kept separate by the lawyer until there is an accounting and severance of interests in the property." Despite Respondent's claim to the proceeds of the Dano settlement check, we have previously determined that others claimed (and had) an interest in the proceeds of that check. Respondent was required to keep the property separate (and in a separate account) until there was an accounting and settlement of the interests in the property. *See In re Berryman*, 764 A.2d 760, 764 (D.C.2000) (because the check was subject to claims by more than one individual, by depositing the check into her own account respondent improperly placed her claim above the claims of others). Under these circumstances, Respondent was required to maintain the proceeds of the check in his trust account (*See In re Moore*, 704 A.2d 1187, 1191 n. 7 (D.C.1997) (per curiam)), and his failure to do so violated this Rule.

### F. *Rule 1.17(a)* [22]

Rule 1.17(a) provides:

Funds coming into the possession of a lawyer that are required by these Rules to be segregated from the lawyer's own funds ... shall be deposited in one or more specially designated accounts at a financial institution. The title of each such account shall contain the words "Trust Account" or "Escrow Account,"

---

**22.** Rule 1.17 was renumbered as Rule 1.19 in the 2007 amendments to the D.C. Rules of Prof'l Conduct.

as well as the lawyer's or the lawyer's law firm's identity.

The check from the D.C. Government was made out to Dano. We have already determined that Mr. Byorick lacked authority to waive Dano's interest in the proceeds of the check and that Respondent had no right to the entire proceeds of the check. Accordingly, it is clear that at least some portion, if not the entire amount, was required to be segregated from Respondent's own funds and deposited into a specially designated account, the title of which contained the words "Trust" or "Escrow" account. Respondent violated this Rule as well.

### G. *Rule 1.4(a)*

▮▮▮▮ Rule 1.4(a) provides that: "A lawyer shall keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information." A lawyer must initiate communications to provide information when needed. *In re Hallmark*, 831 A.2d 366, 374 (D.C.2003). "The guiding principle for evaluating conduct under Rule 1.4(a) 'is whether the lawyer fulfilled the client's reasonable . . .' expectations for information. To meet that expectation, a lawyer not only must respond to client inquiries but also must initiate communications to provide information when needed." *Id.* at 374 (internal punctuation and citation omitted). Comment [5] provides that "[a] lawyer may not withhold information to serve the lawyer's own interest or convenience."

The Hearing Committee tentatively decided that Respondent had not violated this rule. That determination reflected its initial focus on the fact that inquiries to Respondent about the check had been made by neither Mr. Williams directly nor Dano, Respondent's client. Thereafter, the Committee determined its focus was too narrow. As Dano's lawyer, it was Respondent who, after the litigation was completed, would be notified about the decision of the Court and receive any check that the District would ultimately issue. It may be true that Respondent had no duty to respond to the inquiries from Mr. Jones, who at the time of the inquiries was not employed by Dano, but he certainly had a duty to keep his client, Dano, informed about what was going on with the representation, and in this matter that meant that he affirmatively needed to inform Dano about the receipt of the check. That would have been accomplished with notice to Mr. Williams, or any of those inquiring of Respondent on Mr. Williams (or Williams Industries) behalf, but was not accomplished by his letter to Mr. Byorick. Accordingly, the Committee concluded that Respondent had violated Rule 1.4(a). The Board agrees.

### H. *Rule 1.5(f)*

Bar Counsel originally charged a violation of Rule 1.5(f), which on its face appears inapplicable to these proceedings. The Committee at the close of the hearing tentatively determined that Respondent had not violated Rule 1.5(f). Bar Counsel apparently abandoned this claim since it was not referred to in its post hearing submissions. The Committee and Board find no violation of the Rule.

### I. *D.C. Bar R. XI, § 19(f)*

D.C. Bar R. XI, § 19(f) provides that: "Every attorney . . . shall maintain complete records of the handling, maintenance, and disposition of all funds, securities, and other properties belonging to another person. . . ." The Committee at the close of the hearing made no tentative finding with respect to this Rule. Tr. III at 182. It thereafter concluded that there was not clear and convincing evidence to show a

violation. The Board agrees. Respondent's vice in this matter was not one of record-keeping. It was the much more serious one of misappropriating funds.

## V. SANCTION RECOMMENDATION

█ As stated by the Committee, there can be little doubt that disbarment is the appropriate sanction for this matter. We have concluded that Respondent has engaged in intentional misappropriation of funds belonging to another, theft and other violations. The Court's cases make clear that "in virtually all cases of misappropriation, disbarment will be the only appropriate action unless it appears that the misconduct resulted from nothing more than simple negligence." *In re Addams,* 579 A.2d 190, 191 (D.C.1990) (en banc); *See also In re Anderson,* 778 A.2d 330, 336–38 (D.C.2001). The Court has stated "[A] lawyer's obligation to refrain, at the least, from misuse of a client's property must ... stand among the most insistent of professional norms." *Addams,* 579 A.2d at 194 (citations omitted). Because we find that this misappropriation was intentional, the Committee and the Board recommend that Respondent be disbarred.

Respondent's intentional use of the check's proceeds also constituted theft, for which disbarment is also the appropriate sanction. Thus, in *Gil,* where a Respondent "had no authority to deposit the funds in his personal account" and used virtually all of the funds "for his own purposes without [any other interested person's] knowledge or consent" and thus, committed the criminal act of theft in violation of Rule 8.4(b), the attorney was disbarred. *Gil,* 656 A.2d at 305–06. As the Court said in *Gil:*

> [H]ad Respondent been convicted of felony theft, disbarment would have been automatic under D.C.Code § 11–2503(a) (1989).... As the Board observed,

"[R]espondent's betrayal of the trust of his friend ... shows him to be so wanting in his fundamental awareness of right and wrong that his continued membership in the Bar undermines its integrity and poses a threat to future clients."

*Id.* at 306 (citations omitted); *See also In re Slattery,* 767 A.2d 203, 216, 218–19 (D.C. 2001) (despite lack of attorney-client relationship, attorney disbarred for misusing funds under his control).

## VI. CONCLUSION

As did the Committee, we conclude that Respondent has violated Rules 8.4(b), 8.4(c), 1.15(a), 1.15(b), 1.17(a), 1.15(c), and 1.4(a). Based on the seriousness of the misconduct, we recommend that Respondent be disbarred. We further recommend that Respondent's reinstatement be conditioned upon proof by Respondent that he has made restitution to Dano, Mr. Williams, and Williams Industries of the proceeds of the January 8, 1998 check ($241,336), with interest at the legal rate of 6% since that date, less any amounts Respondent can prove he was entitled to as of the date he received the check.

BOARD ON PROFESSIONAL RESPONSIBILITY

By: /s/
Ray S. Bolze

Dated: July 9, 2007

All members of the Board concur in this Report and Recommendations except MS. WILLIAMS, MR. NATHAN, and MS. JEFFREY, who did not participate.